**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,**

v.

**FREMONT CHRISTIAN SCHOOL, Defendant-Appellant.**

No. 84–2779.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 10, 1985.

Decided Feb. 3, 1986.

**1364**

Justine S. Lisser, E.E.O.C., Washington, D.C., for plaintiff-appellee.

William B. Ball, Ball & Skelly, Harrisburg, Pa., for defendant-appellant.

Before ANDERSON, FARRIS, and NELSON, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

Fremont Christian School (Fremont Christian), a church-owned and operated private school, appeals from the district court's order granting the Equal Employment Opportunity Commission's (EEOC) motion for partial summary judgment and an injunction prohibiting unequal compensation of married female and male employees. The district court granted summary judgment to EEOC on the issue of liability on the grounds that Fremont Christian had violated Title VII, 42 U.S.C. § 2000e, *et. seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d), and is barred from raising the religion clauses of the First Amendment as a defense for its personnel policies. The employment policy involved here is a health insurance plan provided by Fremont Christian but only to "head of household" employees interpreted by the school to be single persons and married men. Because of the existence of a strong compelling state interest in eradicating discrimination, coupled with the fact that eliminating the employment policy involved here would not interfere with religious belief, and only minimally, if at all, with the practice of religion, we affirm the judgment of the district court.

## I. Facts

Fremont Christian School is a private educational institution providing instruction from the pre-school years through twelfth grade. It is wholly owned and operated by the Assembly of God Church, located in Fremont, California.

While persons employed by Fremont Christian need not be members of the Fremont Assembly of God Church, they must be a member in good standing of an evangelical church and subscribe to specific tenets of faith. These tenets include the belief that the Bible is to be taken literally. Among the doctrinal beliefs held by the Church is the belief that, while the sexes are equal in dignity before God, they are differentiated in role. In light of this conviction, the Church believes, based on, *inter alia*, Ephesians 5:23, that in any marriage, the husband is the head of the household and is required to provide for that household.

In keeping with this belief, until 1976, the Church and Fremont Christian compensated their married male employees at a rate higher than similarly-situated female employees. After learning in January, 1976, that this practice may have been illegal, the school board determined at its September, 1976 meeting that "[s]ince it is possibly illegal to pay a head of household allowance to employees, it was moved ... and seconded ... to eliminate this provision from our contracts. Motion so carried."

Fremont Christian compensates its employees according to pay scales set for the teaching and administrative staff. For teachers, these take into account years of teaching experience, education, and post-degree continuing education efforts. The pay scales are now applied uniformly to both male and female teachers.

As part of its compensation package, Fremont Christian offers all full-time employees disability and life insurance regardless of sex or marital status, the premiums for which are paid by Fremont Christian.

Fremont Christian also provides health insurance as a fringe benefit. However, this benefit is available only to heads of households, interpreted by Fremont Christian to be single persons and married men. Fremont Christian believes that, in any marriage, only the man can be the head of

the household, regardless of what his salary is in relation to that of his wife. As explained by Rev. Rankin, the superintendent of Fremont Christian, the test for routine eligibility for health insurance for women is whether they are married. If so, the husband is presumed to be the head of the household, rendering women ineligible for health benefits.

In certain situations, however, where the husband is incapable of providing for his family, by virtue of non-working student status, or illness, Fremont Christian undertakes, as an "act of Christian charity," to extend health benefits to a full-time married female employee for the limited period of her husband's incapacity. Nevertheless, the husband is still scripturally the head of the household.

On June 16, 1981, Ruth P. Frost, a married female employee of the School, filed with the EEOC a charge of sex discrimination against Fremont Christian on the ground that it gives health insurance coverage to its married male employees but not (with minor exceptions) to its married female employees. On December 3, 1982, EEOC issued a Notice of Determination in favor of Mrs. Frost. On May 24, 1983, EEOC brought the present action in the United States District Court for the Northern District of California, alleging violations by Fremont Christian of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*, and the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, *et. seq.* Fremont Christian, in its answer, denied violation of either act and raised affirmative defenses under the Religion Clauses of the First Amendment. On December 6, 1983, EEOC moved for partial summary judgment on the liability issue. On April 16, 1984, 609 F.Supp. 344, the district court granted EEOC's motion. The district court, on October 17, 1984, denied Fremont Christian's motion for reconsideration and granted EEOC's motion for injunctive relief. On December 4, 1984, Fremont Christian timely appealed to this court.

## II. Discussion

Fremont Christian presents both statutory and constitutional arguments against application of Title VII to its employment policies. Before reaching Fremont Christian's constitutional arguments, this court must determine whether the dispute may be resolved on statutory grounds. *International Association of Machinists v. Street*, 367 U.S. 740, 749–50, 81 S.Ct. 1784, 1789–90, 6 L.Ed.2d 1141 (1961). "The nature of our inquiry is established by *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 [99 S.Ct. 1313, 59 L.Ed.2d 533] (1979). We must first determine whether the proposed application of the statute 'would give rise to serious constitutional questions.' *Id.* at 501 [99 S.Ct. at 1319]". *EEOC v. Pacific Press Publishing Ass'n.*, 676 F.2d 1272, 1276 (9th Cir.1982). If so, we cannot find the statute applicable unless there is an "affirmative intention of Congress clearly expressed" to apply it. *Catholic Bishop*, 440 U.S. at 501, 99 S.Ct. at 1319; *Pacific Press*, 676 F.2d at 1276.

### A. Application of Title VII

■ The application of Title VII to the employment practice before us would definitely give rise to serious constitutional questions. *See, e.g., Serbian Eastern Orthodox Diocese for the United States and Canada v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952); *Pacific Press*, 676 F.2d 1272 (9th Cir.1982); *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985); *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972). However, we conclude that Congress has clearly expressed the intention that Title VII apply to the present circumstances.

Fremont Christian argues that the exemption created by Section 702 of Title VII, as amended, 42 U.S.C. § 2000e–1 (1982), for religious institutions extends beyond hiring practices and encompasses all other employment practices (e.g., the health insur-

ance compensation program). Both the language and legislative history of Title VII, however, indicate that the statute exempts religious institutions only to a narrow extent. Section 702 provides:

> This subchapter shall not apply ... to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

To be sure, § 702 prohibits some forms of state involvement in ecclesiastical decisions of employment. *See Rayburn,* 772 F.2d at 1166. "If, for example, a religious institution were to present 'convincing evidence' that an employment practice favored members of one faith or denomination over another, '§ 702 deprives the EEOC of jurisdiction to investigate further to determine whether the religious discrimination was a pretext for some other form of discrimination.'" *Id.* (quoting *EEOC v. Mississippi College,* 626 F.2d 477, 485 (5th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981)).

While the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, "religious employers are not immune from liability [under Title VII] for discrimination based on ... sex...." *Pacific Press,* 676 F.2d at 1276. Furthermore, Congress and this court have specifically "rejected proposals that provide[ ] religious employers a complete exemption from regulation under the [Civil Rights] Act [of 1964]." *Id.*

The legislative history reinforces the plain meaning of the statutory text. The original Act passed by the House in 1964 excluded religious employers from coverage altogether. H.R.Rep. No. 914, 88th Cong., 1st Sess. (1964), *reprinted in* 1964 U.S.Code Cong. & Ad.News, 2355, 2391, 2402. The final version excluded such employers only with respect to discrimination based on religion, and then only with respect to persons hired to carry out the employer's "religious activities." P.L. 88–352, Title VII, § 702, 78 Stat. 241 (July 2, 1964), *reprinted in* 1964 U.S.Code Cong. & Ad.News 287, 304. In 1972 the statute was amended to delete the word "religious," P.L. 92–261 § 3, 86 Stat. 103 (March 24, 1972), but Congress specifically rejected proposals to broaden further the scope of the exemption. Subcommittee on Labor of the Committee on Labor and Public Welfare of the United States Senate, Legislative History of the Equal Employment Opportunity Act of 1972 (Comm.Print 1972), at 1229–30, 1258–60. To the contrary, the analysis pertaining to § 702 states clearly that "[s]uch organizations remain subject to the provisions of Title VII with regard to race, color, sex or national origin." Section-by-Section Analysis of H.R. 1946, the Equal Employment Opportunity Act of 1972, *reprinted in id.* at 1844, 1845.

■ Fremont Christian further argues that it is exempted from application of Title VII under the bona fide occupational qualification (BFOQ) exemption, § 703(e), 42 U.S.C. 2000e–2(e). This exemption provides that it shall not be an unlawful employment practice for an employer to admit or employ an individual on the basis of religion, sex, or national origin "in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." Fremont Christian contends that its health insurance compensation program is just such a BFOQ.

It has been noted that this exception does not apply to the full range of possibly discriminatory employment actions. *See* 1 L. Larson, *Employment Discrimination* § 13.00 (1985). "It uses only the words 'to hire and employ,' while the earlier section [§ 703(a) ] detailing unlawful employment practices lists, in addition, such specific acts as 'to discharge' and ... includes a catchall phrase, 'or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment.'" *Id.* at 4–1 to 4–2. "While this disparity between the de-

scription of the offense and the defense has caused little litigation, it should not be overlooked, since the oversight might tempt a defendant *mistakenly to invoke the BFOQ exception in a case involving, say, discrimination in pay." Id.* at 4–2 (emphasis added). Accordingly, we conclude that the BFOQ exception does not apply to the discriminatory provision of benefits involved here.

■ Fremont Christian's final statutory argument is that its health insurance compensation program does not violate the Equal Pay Act because it is based on "any factor other than sex," 29 U.S.C. § 206(d)(1)(iv); in this case, religious beliefs. The EEOC claims that because the "head of household" refers only to men, the health insurance compensation program could not be based on any other factor but sex.

Sometimes differentials in pay to employees performing equal work are said to be based on the fact that one employee is head of a household and the other, of the opposite sex, is not. In general, such allegations have not been substantiated. Experience indicates that where such factor is claimed the wage differentials tend to be paid to employees of one sex only, regardless of the fact that employees of the opposite sex may bear equal or greater financial responsibility as head of a household or for the support of parents or other family dependents. Accordingly, ... the general position of the Secretary of Labor and the Administrator is that they are not prepared to

conclude that any differential allegedly based on such status is based on a 'factor other than sex' within the intent of the statute.

29 C.F.R. § 800.149. We are equally unwilling to conclude that this exception to the Equal Pay Act applies to the particular circumstances of this case.

We now turn to the constitutional questions.

### B. Free Exercise Clause

■ Fremont Christian alleges that Title VII and the Equal Pay Act do not apply to its employment policy of supplying health insurance to the head of the household because it is grounded in religious belief and is therefore shielded by the free exercise clause of the First Amendment. To determine whether a neutrally-based statute, such as Title VII or the Act, violates the free exercise clause, this court weighs three factors: (1) the magnitude of the statute's impact on the exercise of a religious belief; (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief; and (3) the extent to which recognition of an exemption from the statute would impede objectives sought to be advanced by the statute. *Pacific Press,* 676 F.2d at 1279 (citing *Mississippi College,* 626 F.2d at 488 (citing *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972), and *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).[1]

---

1. Fremont Christian contends that the following is a list of genuine issues of material fact that should have precluded a summary judgment: (a) the bona fides of the religious claim (and whether the practice complained of is rooted in doctrine); (b) the substantiality of that claim; (c) whether the Church would be injured in its religious observance and, if so, to what degree, by imposition of the injunction; (d) whether that degree of injury would constitute substantial harm to the Church; (e) whether Fremont Christian is an integral part of the Church, or whether, if so, it is only partly religious; (f) whether the practice complained of is, in fact, a pretext for discrimination; (g) whether it is based on a factor other than sex; (h) whether excessive government-church entanglements

would arise from the granting of the injunction; (i) the nature of a societal interest involved in requiring the Church to abandon its practice, and the degree of that interest; (j) the existence, or not, of means less restrictive for realization of that societal interest, than enjoining and penalizing the Church practice in question.

Issues (a-e) relate to the first part of the *Pacific Press* three-part test, that is, the magnitude of the statute's impact on the exercise of Fremont Christian's religious belief. These facts (a-e) encompass two critical essentials of a Free Exercise Claim: (a) the religious reality, i.e., the scope, rootedness, depth and sincerity of the exercise that is claimed to be absolutely required by a religion, and (b) the reality and

**(1) Magnitude of Statute's Impact upon Exercise of Religious Beliefs**

■ In *EEOC v. Pacific Press Publishing Ass'n*, 676 F.2d 1272 (9th Cir.1982), the plaintiff, an employee of a religiously affiliated publishing house, had two complaints: (1) she was being denied monetary allowances paid to similarly situated male employees, and (2) her employment was terminated in retaliation for filing charges under Title VII. *Id.* at 1275.

Addressing the first complaint, this court held that requiring Pacific Press to refrain from discriminating against the plaintiff, as required by Title VII, does not violate Press's free exercise of its religious beliefs. *Pacific Press*, 676 F.2d at 1279. This court reasoned that "[p]reventing discrimination can have no significant impact upon the exercise of Adventist beliefs because the Church proclaims that it does not believe in discriminating against women or minority groups, and that its policy is to pay wages without discrimination on the basis of ... sex.... Thus, enforcement of Title VII's equal pay provision does not and could not conflict with Adventist religious doctrines, nor does it prohibit an activity 'rooted in religious belief.'" *Id.* (quoting *Wisconsin v. Yoder, supra,* 374 U.S. at 215, 92 S.Ct. at 1533).

Similarly in the present case, Pastor Goree, the head of the Fremont Assembly of God Church, stated: "[T]he Church, believing as it does, in the God-given dignity and the special role of women, could not, without sin, treat women according to unfair distinctions." This would indicate, as it did

in *Pacific Press*, that preventing the sex discrimination involved in this case should have no significant impact on Fremont Christian's religious beliefs or doctrines.

Furthermore, Fremont Christian has previously abandoned a policy of paying the "head of household" at a rate higher than similarly situated female employees (the very problem at issue in *Pacific Press*) because they felt it may have been illegal to continue to do so. We find this to be evidence that there would be no substantial impact upon religious beliefs by forcing Fremont Christian to drop a similar policy of giving heads of household health insurance, to the exclusion of similarly situated women. Finally, the female employees at Fremont Christian are eligible for group life and disability insurance and the School's wages and other usual conditions of employment are comparable for all employees, regardless of sex. The district court held that "if those practices do not undermine the School's religious goals then it is inconceivable that providing health benefits to female employees will have the opposite effect." We agree.

**(2) Compelling State Interest**

*Pacific Press* speaks clearly to the importance of eliminating employment discrimination in relation to actions by the EEOC that would have a *substantial* impact on the exercise of religious beliefs. "By enacting Title VII, Congress clearly targeted the elimination of all forms of discrimination as a 'highest priority'.... Congress' purpose to end discrimination is

---

substantiality of the injury which the religion will sustain if a challenged governmental requirement is enforced.

We find, upon a de novo review of the record, that there are no genuine issues of material fact as to "religious reality." The district court and the EEOC both concede the religious reality of the policy of providing health insurance to the head of the household. Therefore, any "facts" relating to religious reality are undisputed. Summary judgment was also properly granted on the issues relating to the "substantiality of the injury" to the religion. The district court found that the substantiality of the injury to the religion would be minimal. As discussed infra, we conclude that this finding is correct.

We uphold the district court's finding on issue (f) that Mrs. Frost's demonstration of the employer's justification as a pretext for discrimination, was so conclusive that as a matter of law Fremont Christian could not justify or rebut it. *See Muntin v. State of California Parks & Recreation Dept.,* 671 F.2d 360, 362 (9th Cir.1982); *Gerdom v. Continental Airlines, Inc.,* 692 F.2d 602, 609 (9th Cir.1982), *cert. denied,* 460 U.S. 1074, 103 S.Ct. 1534, 75 L.Ed.2d 954 (1983).

Finally, we conclude that issues (g-j) were properly decided on summary judgment because they were questions of law.

equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions. *E.g., Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (state law prohibiting retail sales on Sunday)." *Pacific Press,* 676 F.2d at 1280.

Eliminating the employment policy involved here would not interfere with religious belief and only minimally, if at all, with the practice of religion. Because the impact on religious belief or practice is minimal and the interest in equal employment opportunities is high, the balance weighs heavily in favor of upholding Fremont Christian's liability under Title VII for its sexually discriminatory health insurance compensation program. *See Pacific Press,* 676 F.2d at 1279.

### (3) Least Restrictive Means

It has been recognized that although EEOC jurisdiction over religious organizations may have far-reaching effects should the Commission seek injunctive relief, as in this case, or monetary damages against a religious employer, "the relevant inquiry is not the impact of the statute upon the institution, but the impact of the statute upon the institution's exercise of its sincerely held religious beliefs." *Pacific Press,* 676 F.2d at 1280 (quoting *Mississippi College,* 626 F.2d at 488). Having found the impact on religious beliefs to be minimal at best, we find this third factor to be satisfied.

### C. The Establishment Clause

■ Fremont Christian also contends that the injunction granted pursuant to Title VII violates the establishment clause of the First Amendment because it creates excessive government-church entanglements. Examining whether Title VII and the Equal Pay Act violate the establishment clause involves yet another three-part

---

**2.** The other two parts of the test for determining the validity of a statute under the establishment clause are: (1) the statute must have a secular purpose, and; (2) its principal or primary effect

test. *See Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Only the third part—whether the statutes foster excessive government entanglement with religion—is disputed by the parties.[2] To determine whether a statute creates excessive entanglement, courts examine three factors: (1) the character and purpose of the institution involved; (2) the nature of the regulation's intrusion into church affairs, and (3) the resulting relationship between the government and the religious authority. *Lemon,* 403 U.S. at 615, 91 S.Ct. at 2112; *Pacific Press,* 676 F.2d at 1282.

### (1) Character and Purpose of Institution

■ Fremont Christian contends that because the School is an integral part of the religious mission of the Church to its children, coupled with the highly specialized role of the teacher, a role it claims to be a ministry, the entanglement implications are significant.

There is a trilogy of cases pertinent to this point. First, in *McClure v. Salvation Army,* 460 F.2d 553 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972), the Fifth Circuit held that application of Title VII to the employment relationship between a church and its ministers violated the establishment clause. The court emphasized that the relationship between a church and its ministers is its "lifeblood." The relationship was recognized as of prime ecclesiastical concern. *Id.* at 558–59; *Pacific Press,* 676 F.2d at 1278.

However, the Fifth Circuit refused to broaden the *McClure* exemption for ministers to include the faculty at Mississippi College, a sectarian school, noting that:

"The College's faculty and staff do not function as ministers. The faculty members are not intermediaries between a church and its congregation. They nei-

---

must be one that neither advances nor inhibits religion. There is no question that Title VII meets the first two parts of this test.

ther attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine."

*Mississippi College*, 626 F.2d at 485.

Finally, in *Pacific Press*, this court refused to apply the *McClure* exemption to an employee of a religious publishing house. This court held that her duties did not fulfill the function of a minister, but were more analogous to those of the support staff and regular faculty at Mississippi College. *Pacific Press*, 676 F.2d at 1278.

We find that the duties of the teachers at Fremont Christian School do not fulfill the function of a minister.

### (2) Nature of Regulation's Intrusion

The intrusion at issue in this case is an injunction requiring Fremont Christian to comply with Title VII and the Act. In *Pacific Press*, the court held that "neither the judgment in this suit nor Title VII's enforcement mechanisms result in any ongoing scrutiny of Press' operations." *Pacific Press*, 676 F.2d at 1282. The presence, here, of another level of government involvement—that of the court issuing an injunction—does not make this case substantially different. "The potential for *ongoing entanglement* or *continuous supervision* ... is the critical entanglement issue...." *Id.* (emphasis added). A Title VII action is potentially a lengthy proceeding, involving state agencies and commissions, the EEOC, the federal trial courts and courts of appeal. Church personnel and records would inevitably be subject to subpoena, discovery, cross-examination— the full panoply of the legal process. However, as pointed out in a well-reasoned opinion by the Fourth Circuit, churches are not—and should not be—above the law. "Their employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions." *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir.1985). In *Rayburn*, the employment decision involved dealt with the selection of the church's ministers. It was held in that case that the religion clauses precluded the involvement of the EEOC and the application of Title VII.

The employment practices involved in the present case are subject to Title VII scrutiny.

### (3) Resulting Relationship between Government and School

This factor relates closely to the second factor just discussed. Also, it has been held that the "relationship between the federal government and the College that results from the application of Title VII does have limits both in scope and effect." *Mississippi College*, 629 F.2d at 487. EEOC's relationship to religious employers threatens no more entanglement than other statutes which regulate employee compensation at religious institutions. *Pacific Press*, 676 F.2d at 1282. *See generally Mitchell v. Pilgrim Holiness Church Corp.*, 210 F.2d 879 (7th Cir.), *cert. denied*, 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed. 1136 (1954) (minimum wage law).

The partial summary judgment and the injunction of the district court are

AFFIRMED.