**UNITED STATES DEPARTMENT OF LABOR and United States Equal Employment Opportunity Commission, Plaintiffs,**

v.

**SHENANDOAH BAPTIST CHURCH, a religious association operating as Roanoke Valley Christian School, Defendant,**

**and**

**Carol C. Anderson, Lola D. Clifton, Loretta B. Dillon, Dorothy M. Dixon, Alma S. Greene, Delilah F. Gross, Margaret Harvey, Mary Ann Herndon, Jeffrey P. Kessler, John T. Kessler, Shirley I. Kessler, Joyce T. Martin, Eva T. Murdock, Sherry R. Padgett, Antoinette L. Parsons, Barbara C. Shelor, Donna Shelor, Mary Beth Shelor, Ann T. Shelton, Ruth Wesselink, Linda M. Womack, Intervenor–Defendants.**

Civ. A. No. 78–0115–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

Feb. 7, 1989.

---

Marshall H. Harris, Don Stacey, Office of the Solicitor, U.S. Dept. of Labor, Philadelphia, Pa., Joan Roller, E.E.O.C., Baltimore, Md., for plaintiffs.

Donald W. Huffman, Bird, Kinder & Huffman, Roanoke, Va., for defendant.

## MEMORANDUM OPINION

TURK, Chief Judge.

The government has moved the court to enter judgment in its favor, and one of the two governmental plaintiffs, the United States Department of Labor, also prays for certain prospective injunctive relief, in this action against a church for asserted violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201–219 (1982 & Supp. IV 1986), in its operation of a school.

Defendant Shenandoah Baptist Church ("Shenandoah") is an unincorporated association that operates a preschool and an elementary and secondary school in Roanoke, Virginia, that is collectively known as Roanoke Valley Christian School ("Roanoke Valley").[1] In this action, filed in May, 1978,[2] the government brings minimum wage and equal pay claims based on wages and salaries Shenandoah paid school employees between 1976 and 1986. The parties stipulate that between 1976 and 1982, Shenandoah paid hourly wages that fell below the statutory minimum levels in effect at the time to a total of 91 persons who worked at Roanoke Valley in positions other than as teachers or administrators. The government contends that by this practice Shenandoah violated § 206(a), (b). The parties also stipulate that in each school year between 1976 and 1986 Shenandoah paid most of Roanoke Valley's full-time male teachers a stipulated amount greater

---

1. The Department of Labor initially named as defendant Shenandoah Baptist Ministries Association, an unincorporated association. In 1982, plaintiffs began identifying the defendant as Shenandoah Baptist Church in papers filed with the court, and counsel for defendant followed suit beginning in 1987. Neither Shenandoah Baptist Ministries Association nor Shenandoah Baptist Church has objected to this substitution, and during trial of this action counsel for Shenandoah repeatedly alerted the court and the advisory jury to the fact that the church was the defendant in the case. The other defendants intervened in the case in 1984.

2. The court added the Equal Employment Opportunity Commission as a co-plaintiff by an order entered in September, 1979. Since that time, the Department of Labor has pursued minimum wage claims against Shenandoah, while the EEOC has pursued equal pay claims.

than the salaries paid to most of its full-time female teachers. During those years, the parties stipulate, "[t]he skill, effort, responsibility and working conditions" of the men and women who taught at the school were "substantially equal." The government contends that by paying most men more than most women Shenandoah violated 29 U.S.C. § 206(d).

This court entered partial summary judgment for the government in 1983 and held that the Act required Shenandoah to pay employees other than teachers or administrators at least the statutory minimum amount. *Donovan v. Shenandoah Baptist Church*, 573 F.Supp. 320 (W.D.Va.1983). In so holding, the court ruled that Shenandoah could not assert the First Amendment rights of its school employees, whose interests the court found to be "adverse" to the church's own. *Id.* at 325–26.

In response, 21 of the 91 present and former school employees who are the subjects of the government's minimum wage claim petitioned the court to let them intervene as defendants in the case in order to assert their First Amendment rights. The court granted the employees' motion to intervene in 1984.

The remaining issues were tried to the court sitting with a seven-member advisory jury on September 26–29, 1988. Shenandoah and the group of 21 intervening defendants were represented by separate counsel. Immediately upon conclusion of the evidence, the court entered partial judgment for the government. The court ruled that the equal pay provisions of the Fair Labor Standards Act, 29 U.S.C. § 206(d), apply to Roanoke Valley, just as the minimum wage provisions do. Based on the parties' stipulation that Shenandoah had paid 91 non-teaching school employees hourly wages less than the statutory minimum, the court also found that Shenandoah had violated the minimum wage requirement. In addition, the court ruled that requiring Roanoke Valley's non-teaching staff to receive the minimum wage would not infringe the First Amendment rights of the 21 intervening defendants.

The court then posed two special interrogatories to the advisory jury with respect to the government's equal pay claim. The jury answered the questions by finding from a preponderance of the evidence, first, "that the female school teachers employed by [Shenandoah at Roanoke Valley] were paid less than the male teachers who were performing equal work" and, second, that the salary differential Shenandoah used for teachers at Roanoke Valley was "not based on a factor other than sex."

Counsel for the government and for Shenandoah made oral argument to the court in January about what relief should be awarded the government. It now becomes the court's duty to "find the facts specially and state separately its conclusions of law thereon," Fed.R.Civ.P. 52(a), and to enter judgment pursuant to Fed.R. Civ.P. 58.

### Findings of Fact

The Reverend Robert L. Alderman, then the pastor of a Baptist church in Appomatox, Virginia, came to Roanoke in 1970 and joined others in organizing Shenandoah Baptist Church in 1971. The church is an independent Baptist church and is not affiliated with any organization of churches. The church's general membership now numbers about 1,500 persons. Its pastor, Dr. Alderman, testified that the church considers Christian education to be its "total ministry," and the court accepts this characterization of how Shenandoah's members perceive the church's mission.

To carry out its education ministry, the church conducts Sunday school classes. In addition to the church's general membership, the Sunday school has about 700 auxiliary members. In 1973, the church extended its education ministry by opening a kindergarten and primary school on its premises. By 1977, the school offered instruction through grade 12. Roanoke Valley Christian School is accredited by the Commonwealth of Virginia and by the Association of Christian Schools International. The school is operated in buildings adjacent to the church's sanctuary in Roanoke, and the church uses the buildings for other activities. Teachers at the school are em-

ployed by the church and are on its payroll. Tuition and other revenues the school receives do not cover its expenses, and church offerings make up the shortfall.

As Roanoke Valley expanded into the high school grades and required teachers for increasingly specialized subjects, Shenandoah sought teachers for the school from outside the congregation, both locally and among various Christian colleges and universities around the country. Church leaders concluded that to attract suitable teachers for more specialized subjects, the school would need to offer salaries that would allow teachers to support families. Dr. Alderman testified that church leaders looked to scripture to determine which of Roanoke Valley's teachers were heads of household, and Shenandoah began paying supplements above the base teaching salary to those teachers. The court accepts these statements.

The parties stipulate that all of the school's full-time married male teachers received the supplement between 1976 and 1986. Church leaders notified the school's teaching staff in 1977 that it had implemented the head-of-household supplement policy the previous fall. No women received the supplement until 1981. Between 1981 and 1986, the church paid the supplement to three divorced female teachers who had dependents. No other female teachers, married or single, received the bonus, nor was it paid to the one single male teacher employed full-time at the school during the period. The female teachers who did not receive the head-of-household supplement included a woman whose husband was a full-time graduate student and another who raised two children with her teaching income alone after her husband, who had become disabled and mentally ill, left the family. A third wom-

an who was raising two children was not paid the supplement for two years while she was separated from her husband, although she did receive it after her divorce became final. The parties' stipulations indicate that if all the full-time women teachers who were not paid the supplement had been, their salaries would have been larger by a total of $177,680.

Shenandoah discontinued its head-of-household bonus at Roanoke Valley in 1986, eight years after the government filed this action, because the church's financial position had allowed it to increase teachers' base salaries so much that church leaders concluded that the base salary alone would allow teachers to support families. Base salaries, which Shenandoah supplemented in uniform fashion for prior teaching experience, rose from $5,808 in 1976–77 to $12,512 in 1985–86.[3] Dr. Alderman testified that he and other church leaders have sincerely believed that the Fair Labor Standards Act does not apply to Roanoke Valley. The court accepts this testimony.

As mentioned above, the parties stipulate that 91 persons who worked at Roanoke Valley in positions other than as teachers or administrators received hourly wages below the statutory minimum level between 1976 and 1982. The difference between the total amount each employee would have received during the period, had he or she been paid at the statutory minimum hourly rate, and the total amount each actually received ranged from $5.64 to $807.26.[4] The parties stipulate that together the employees received a total of $16,818.46 less than they would have at the statutory minimum rate. The 91 employees included bus drivers, custodians, bookkeepers and secretaries at Roanoke Valley, some of whom did work for Shenandoah

---

**3.** Other testimony gave some indication of the actual salaries, base salaries plus any bonus for teaching experience, paid to women who taught at Roanoke Valley during the period. A fifth grade teacher testified, for example, that she received $5,000 during the 1974–75 school year, $5,600 in 1975–76 and $6,200 in 1976–77. A first grade teacher was paid $5,808 in 1976–77 and $6,220 in 1977–78. A second grade teacher received $6,308 in 1976–77, $6,720 in 1977–78

and $7,342 in 1978–79. Another teacher, apparently also of elementary school students, was paid $8,100 in 1979–80 and $9,573 in 1981–82.

**4.** Intervening defendant Donna Shelor was the person who received $807.26 less than she would have, had she been paid at the statutory minimum rate.

**1456**

that was unrelated to the school while they were on the payroll. Some of the employees who were paid less than the minimum wage were Roanoke Valley students at the time, while one other received tuition assistance for her family during the period she was working.

Of the teachers who testified at trial, some said they were not formal members of Shenandoah while they taught in its school; others testified that they were church members. The court accepts this testimony and finds that some of the teachers who are the subject of the government's complaint were church members, while others were not. Dr. Alderman testified that the 91 employees who received hourly wages less than the statutory minimum all were church "members in the category of their specific ministry." The meaning of this statement is unclear to the court. The court finds that the evidence does not show whether all 91 persons on the school's staff who are the subject of the government's minimum wage claim were members of the church.

All the teachers and other school employees who testified at trial stated that they considered their work to be a personal ministry. Under questioning from the government, however, they also said that they were not clergy in the sense of having been ordained, leading a congregation or performing such sacerdotal functions as baptisms or marriages. Dr. Alderman testified that Baptists view a distinction between persons who hold such clerical offices as pastor, deacon or bishop and the ministry of all believers.

### Conclusions of Law

This case has required the court to determine whether the federal minimum wage provisions, as enacted by Congress and absent any extrastatutory constitutional defense the church might be entitled to assert, would apply to Shenandoah's employment relationship with Roanoke Valley's non-teaching staff. The court must similarly determine if the federal equal pay provisions would apply to the church's employment relationship with the school's teachers, absent an extrastatutory defense.

If the provisions would apply, the court must determine whether Shenandoah has violated them. If the church has violated the provisions, the court must examine any constitutional defenses it raises. If applying the measures to Shenandoah would not violate the Constitution, the court must decide what relief to award the government.

### (a) Construction of Minimum Wage Provision

■ As noted above, the court entered partial summary judgment for the government in 1983 and held that the federal minimum wage statute required Shenandoah to pay Roanoke Valley employees other than teachers or administrators at least the statutory minimum amount. *Donovan v. Shenandoah Baptist Church*, 573 F.Supp. 320 (W.D.Va.1983). The court held that *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), required the court to determine if applying the minimum wage statute to the school would pose a "significant risk" of infringing the church's First Amendment rights. *Shenandoah*, 573 F.Supp. at 321–22. If applying the provision to the school would pose such a risk, the court ruled, the measure should be construed to apply to church-operated schools only if Congress "clearly and affirmatively intended" such a result. *Id.* at 322. If such an intent were found and the measure was to be applied to the school, the court then had to determine if such application would run afoul of the First Amendment. *Id.*

The court concluded that requiring the church to comply with federal minimum wage requirements in operating its school might "pose serious constitutional questions." The court therefore canvassed the legislative history of the minimum wage statute and determined that Congress had "clearly intended" it to apply to church-operated schools. *Id.*

The court's holding finds support in a subsequent decision of the Supreme Court, *Tony and Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985). That case involved the employment relationship between a

nonprofit corporation that operated as a church and its employees who worked in the foundation's filling stations, retail stores and other endeavors. The foundation resisted application of the minimum wage, overtime and recording requirements of the Fair Labor Standards Act, 29 U.S.C. §§ 201–219, to its business concerns. The court noted that when Congress broadened the Act's coverage in 1961, it excluded from the definition of covered enterprise, 29 U.S.C. § 203(r), (s), activities of "eleemosynary, religious, or educational organizations not operated for profit" because such activities were not performed for a "business purpose," as required by § 203(r) for coverage under the Act. *Id.* at 297 & n. 14, 105 S.Ct. at 1959 & n. 14 (quoting S.Rep. No. 1744, 86th Cong., 2d Sess. 28 (1960)). The court held, however, that Congress did not exempt "commercial activities conducted by religious or other nonprofit organizations" from the Act's requirements. *Id.* at 296–97, 105 S.Ct. at 1959 (footnote omitted). The court reiterated that the Act should be construed "liberally to apply to the furthest reaches consistent with congressional direction," *id.* at 296, 105 S.Ct. at 1959, and that "exemptions from the Act are 'narrow and specific,' implying that 'employees not thus exempted ... remain within the Act,'" *id.* at 296 n. 13, 105 S.Ct. at 1959 n. 13 (quotations omitted). Moreover, the court ruled that "the purposes of the Act require that it be applied even to those who would decline its protections." *Id.* at 302, 105 S.Ct. at 1962.

There is no suggestion, of course, that Shenandoah operates Roanoke Valley for profit. As this court observed in 1983, however, Congress amended the Act in 1966 to include schools in its coverage. Specifically, Congress included "a preschool, elementary or secondary school ... (regardless of whether or not such ... school is public or private or operated for

profit or not-for-profit)." 29 U.S.C. § 203(s)(5). Moreover, Congress expressly defined schools' not-for-profit operations as being performed for a "business purpose" and therefore subject to the Act's coverage. The Act now states that "the activities of any person or persons ... in connection with the operation of ... a preschool, elementary or secondary school ... (regardless of whether or not such ... school is public or private or operated for profit or not for profit) ... shall be deemed to be activities performed for a business purpose." 29 U.S.C. § 203(r)(1). Since the operations of private, not-for-profit schools are now defined in the statute as being carried on for a business purpose, they fall outside the exemption for non-profit activities of charitable organizations.

Congress' conference report on the 1966 amendment confirms this construction. The conference committee stated that the amendment extended minimum wage and overtime coverage to school employees, except that teachers and administrators were exempted from the minimum wage and overtime requirements. Conf.Rep. No. 2004, 89th Cong., 2d Sess., *reprinted in* 1966 *U.S.Code Cong. & Admin.News* 3002, 3048. The exemption for teachers and academic administrative personnel is codified in 29 U.S.C. § 213(a)(1) (1982).

*EEOC v. Fremont Christian School,* 781 F.2d 1362 (9th Cir.1986) offers direct authority for the court's ruling. In that case, the Ninth Circuit applied the equal pay provisions of the Act to a church-operated school, even though the court had concluded that to do so "would definitely give rise to serious constitutional questions." *Id.* at 1365.[5] This court therefore reaffirms its ruling that Congress clearly intended the Act to apply to church-operated schools.[6]

---

**5.** *Fremont* involved application both of the equal pay provisions and of Title VII, 42 U.S.C. § 2000e *et seq.* The court's statement about "constitutional questions" could be read to refer only to Title VII. Since the court was considering both statutes at once, however, it seems to have been referring to both.

**6.** In *Tony and Susan Alamo Found.,* the Supreme Court concluded that the Act posed no "significant risk" to the First Amendment rights of the Alamo Foundation or its members and therefore held that "we do not require any clearer expression of congressional intent to regulate these activities." 471 U.S. at 298 n. 18, 105 S.Ct. at 1960 n. 18. In this case, by contrast, the

**1458**

### (b) Construction of Equal Pay Statute

█ Congress amended the Fair Labor Standards Act in 1963 to include 29 U.S.C. § 206(d), which bars employers from engaging in pay discrimination on the basis of sex. While the Act exempts teachers and administrators from most of its provisions, it does not exempt them from the equal pay requirement. 29 U.S.C. § 213(a). The House committee report explains that the 1966 amendment, called the Equal Pay Act, was intended to make sex discrimination a violation of the Fair Labor Standards Act by adding "one additional fair labor standard to the act: that employees doing equal work should be paid equal wages, regardless of sex." H.R.Rep. No. 309, 88th Cong., 1st Sess., *reprinted in* 1963 *U.S.Code Cong. & Admin.News* 687, 688 (1963). Since the equal pay amendment is an integral part of a unified Act, the equal pay provision applies to Shenandoah's school employees for the same reasons that the minimum wage provisions do. As noted above, the Ninth Circuit recently held the equal pay provisions applicable to a church-operated school much like Roanoke Valley. *Fremont Christian School, supra.*

### (c) Compliance with the Act

There is no allegation that Shenandoah has failed to comply with the minimum wage requirement since 1982 or that it has violated the equal pay provisions since 1986. The parties' stipulations, however, indicate that the church did violate the minimum wage measure in operating its school between 1976 and 1982. The parties' stipulations, together with the evidence, indicate that the head-of-household supplement Shenandoah paid between 1976 and 1986 was extended on the basis of sex. The advisory jury found, and the court concludes, that the supplement was not based on a factor other than sex. The court must therefore enter judgment for the government unless, as defendants contend, en-

forcement of the Act would run afoul of the First Amendment.

### (d) Constitutional Claims

The defendants advance three principal constitutional defenses to enforcement of the Act, all derived from the First Amendment's religious clauses. First, they assert that requiring them to conform to the Act would interfere with the free exercise rights both of the school's employees and of the church and its members who hire them. Second, they assert that governmental enforcement of the Act as to them would violate the Establishment Clause by impermissibly entangling government with religion. Finally, they assert that an exemption from the Act for members of religious orders which defendants infer from the legislative history of the 1966 amendment must be applied to them or would violate the Establishment Clause by favoring certain denominations over others.

### (1) Free Exercise Contentions

█ In entering summary judgment for the government in 1983, the court determined that the government had a "great" interest "in ensuring that workers are paid a wage sufficient to provide for themselves and their families." *Shenandoah, supra,* 573 F.Supp. at 326. The court concluded that this interest outweighed any burden the court found enforcement of the minimum wage laws would have on Shenandoah's free exercise rights.

Defendants point to *Corporation of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987), where the Supreme Court stated that the government "may (and sometimes must) accommodate religious practices ... without violating the Establishment Clause." *Id.,* 107 S.Ct. at 2867. Defendants argue that this language supports their contention that the government must allow church employees to work for the school— that is, carry out what they view as their

court has found that applying the Act to defendants would raise "serious constitutional questions." The court finds, however, that the statu-

tory language on which it relies suffices to indicate Congress' intent clearly.

religious ministry—at the wage they choose, regardless of the minimum wage and equal pay laws. *Amos* addresses how far the government may accomodate religion without violating the Establishment Clause. The decision does not spell out, however, how far the government must accomodate religion in order to comport with the Free Exercise Clause.

The Supreme Court made a similar statement in *Hobbie v. Unemployment Comm'n of Fla.*, 480 U.S. 136, 144–45, 107 S.Ct. 1046, 1051–52, 94 L.Ed.2d 190 (1987).[8] Unlike *Amos, Hobbie* addresses the requirements of the Free Exercise Clause. There the court found that a state had violated the Clause when it denied unemployment compensation to a convert to the Seventh–Day Adventist Church, discharged from her job because she had refused to work on her Sabbath, on the grounds that the woman's refusal to work scheduled shifts "constituted 'misconduct connected with [her] work.'" *Id.* at 139, 107 S.Ct. at 1048. The court held that when the state denied an "important benefit … because of conduct mandated by a religious belief," it created "a burden on religion" such that the state's policy would comport with the First Amendment only if justified by a "compelling" state interest, an interest the court found lacking in *Hobbie*. *Id.* at 141, 107 S.Ct. at 1049.

This case, however, involves no denial of a governmental benefit, as in *Hobbie,* and the Supreme Court's decision in *Tony and Susan Alamo Found., supra,* offers more pointed guidance. There the court found no violation of the Free Exercise rights of a church or its members when the government required the church to comply with the minimum wage and overtime requirements of the Act in operating commercial enterprises. The court ruled that the Free Exercise Clause "does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights." 471 U.S. at 303, 105 S.Ct. at 1962. If religious con-

victions had motivated the employees to decline the full pay to which the Act entitled them, the court observed, they were free to return what they wished, "provided that they do so voluntarily." *Id.* at 304, 105 S.Ct. at 1963. Assuming that these same convictions did indeed lead the employees to return additional wages to the church, applying the Act to the church would work only "a slight change" in "the current state of affairs." *Id.* at 304 & n. 29, 105 S.Ct. at 1963 & n. 29. The court concluded: "We therefore fail to perceive how application of the Act would interfere with the [employee-members'] right to freely exercise their religion." *Id.* at 304–05, 105 S.Ct. at 1963–64.

Here, too, the court concludes that applying the minimum wage and equal pay provisions of the Act will not interfere with the Free Exercise rights of school employees who are church members. Since church members may return whatever they choose to the church, applying the act imposes no perceptible burden on their free exercise.

██ Another Supreme Court decision, *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), which this court cited in its summary judgment opinion, answers the argument that the church and its members who have hired the school teachers and staff will have their free exercise rights impermissibly burdened if they are required to comply with the minimum wage and equal pay laws. There the court held that requiring an employer to pay social security taxes on his employees' behalf would not violate his free exercise rights, even though his religious beliefs led him to oppose the social security retirement system. The court accepted that paying social security taxes "interfered" with such an employer's free exercise rights, *id.* at 257, 102 S.Ct. at 1055, but it also found that the government's interest "in assuring mandatory and continuous participation in and contribution

---

**8.** "This Court has long recognized that the government may (and sometime must) accommodate religious practices and that it may do so without violating the Establishment Clause." 480 U.S. at 144–45, 107 S.Ct. at 1051 (footnote omitted).

to the social security system is very high." *Id.* at 258–59, 102 S.Ct. at 1056. In addition, the court noted that to exempt such an employer from the requirement of paying for his employees' social security would itself raise constitutional questions because it would "impose the employer's religious faith on the employees." *Id.* at 261, 102 S.Ct. at 1057. "[E]very person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice his religious beliefs," the court concluded. *Id.* It held that the governmental interest—which could be undermined if various religious convictions could provide a defense to paying taxes—outweighed the burden on the employer's free exercise. *Id.* at 260, 102 S.Ct. at 1057. *See also Employment Div., Dept. of Human Resources of Oregon v. Smith,* — U.S. —, 108 S.Ct. 1444, 1451, 99 L.Ed.2d 753 (1988) (First Amendment's protection of "legitimate claims to the free exercise of religion ... does not extend to conduct a State has validly proscribed.") (quotation omitted); *Bob Jones University v. United States,* 461 U.S. 574, 604, 103 S.Ct. 2017, 2035, 76 L.Ed.2d 157 (1983) ("overriding governmental interest in eradicating racial discrimination in education" outweighed burden on religious beliefs of denying tax benefits to university and school that engaged in racial discrimination.)

The court does not dispute that complying with the Act might add some financial burden to Shenandoah in carrying out its perceived educational mission.[9] The court must accept the church's assertion that its religious beliefs impel it to operate a school, for "courts may not inquire into the truth, validity, or reasonableness of a claimant's religious belief." *Hobbie, supra,* 480 U.S. at 144 n. 9, 107 S.Ct. at 1051 n. 9. However, the court reaffirms its determination that the government has a "great" interest in enforcing the minimum wage laws uniformly. *Shenandoah, su-*

*pra,* 573 F.Supp. at 326. The same can be said of uniformly enforcing the equal pay provisions. Furthermore, to the extent that the school's employees share its religious conviction that the school's financial needs deserve a portion of the salary to which the law entitles the employees, the employees can be expected to lighten the financial burden enforcing the Act would have on the church by returning what they believe appropriate. And to the extent that the employees would prefer to retain the additional pay to which the law entitles them, creating an exemption for the employer would, as in *Lee, supra,* raise First Amendment questions of its own. The court concludes that the governmental interest in enforcing the minimum wage and equal pay laws outweighs whatever financial burden enforcing those laws may impose on Shenandoah's exercise of its members' religious beliefs. Applying the Act to Roanoke Valley's employees therefore does not violate Shenandoah's free exercise rights as their employer. *See Fremont Christian School, supra,* 781 F.2d at 1368–69.

### (2) Entanglement Contentions

■ Defendants' second defense to the government's claim that Shenandoah has violated the Act is that enforcement would run afoul of the Establishment Clause by impermissibly entangling the government with religion. The Establishment Clause prohibits the "active involvement of the sovereign in religious activity," and excessive state entanglement with religion therefore violates the clause. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). In its summary judgment opinion, this court found that the Act's record keeping and reporting requirements, and its provision allowing the government to investigate possible violations, 29 U.S.C. § 211 (as amended, Supp.

---

9. In its summary judgment decision, this court rejected the argument that Shenandoah's free exercise rights were burdened by the mere fact of having to submit to state authority. The court reasoned that such an argument was belied by the church's acquiescence in governmental enforcement of sanitation and fire codes.

573 F.Supp. at 326. At trial, Dr. Alderman acknowledged that abiding by such regulation did not burden the church. Rather than focus on Shenandoah's free exercise rights as an employer, he emphasized the rights of school employees. *See* Trial Transcript, Sept. 27, 1988, at 2–83 to 2–84.

III 1985), would not excessively intrude on Shenandoah's religious activity.

A recent Supreme Court decision bears out this conclusion. *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed. 2d 512 (1986), involved a church-operated school's claim that the First Amendment would be violated if a state anti-discrimination agency investigated a teacher's sex discrimination claim. The teacher asserted that her termination had violated state statutory law; the school replied that it had discharged her for religious reasons. Without deciding whether the agency could constitutionally take action against the school once it had completed its investigation, the court held that the agency would "violate[ ] no constitutional rights by merely investigating the circumstances of [the teacher's] discharge in this case, if only to ascertain whether the religious-based reason was the reason for the discharge." *Id.* at 628, 106 S.Ct. at 2724. The court noted that the state had an "important" interest in eliminating sex discrimination and stated that "[e]ven religious schools cannot claim to be wholly free from some state regulation." *Id.* This court concludes that the record keeping, reporting and investigative provisions of the Act would entangle the state in defendants' religious activity to no significantly greater extent than the state investigation upheld in *Dayton Christian Schools.* And, as the Ninth Circuit ruled in *Fremont Christian School, supra,* a one-time enforcement order is even less intrusive than the "potential for ongoing entanglement" which continuous supervision entails. 781 F.2d at 1370.[10]

### (3) Contention as to Denominational Preference

■ Defendants also argue that the legislative history of the 1966 amendment to the Act, which added schools to its cover-age, supports a finding that members of a religious order are exempt from the Act's coverage. Defendants contend that the exemption exists and must be applied to the Shenandoah's school employees who worked in the school to carry on what they perceived as their personal ministry. Defendants argue that if the exemption is construed narrowly to apply exclusively to religious orders of a kind peculiar to certain denominations, it would impermissibly favor those denominations and disfavor groups like Baptists in whose organization religious orders have no part.

Defendants infer the religious order exemption from a brief portion of the House floor debate on that part of the 1966 amendment that added elementary and secondary schools to the Act's coverage. During the debate, Representative Pucinski of Illinois asked Congressman Collier of Nebraska, the sponsor of the amendment dealing specifically with elementary and secondary schools, if nuns who worked in a parochial elementary school's cafeteria would "have to be paid a minimum wage." Congressman Burton of California, a member of the House Education and Labor Committee, which sponsored the legislation to which Mr. Collier's amendment applied, replied that members of religious orders were not under the Act's definition of employee and thus were not covered by the Act. Mr. Collier concurred in Mr. Burton's explanation. 112 Cong.Rec. 11371 (1966).

It is true that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente,* 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982). In *Larson,* the court struck down a state statute that placed special regulations on religious organizations that drew more than half of their contributions from non-members, regula-

---

**10.** Because the court finds that applying the Act to Shenandoah does not impermissibly entangle the government with religion, the court need not consider defendants' argument that *Corporation of Presiding Bishop of Church of Latter-Day Saints v. Amos,* 483 U.S. 327, 107 S.Ct. 2862, 2867, 97 L.Ed.2d 273 (1987), requires the court to reconsider its conclusion that exempting Roa-noke Valley from the operation of the Act would lead to "impermissible direct State subsidization of sectarian schools and their religious activities." 573 F.Supp. at 325. *See also Forest Hills Early Learning Center v. Grace Baptist Church,* 846 F.2d 260 (4th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989).

tions that did not apply to organizations that received half or more of their donations from their own members. Since the rule "clearly" preferred some denominations over others, the court held, the state required a "compelling" interest to justify its law, an interest the court found wanting.

To the extent that such an exemption might be inferred from the Act's legislative history, the court concludes that Congress did not intend it to apply to the school employees who testified at trial. The statutory language provides that the Act applies to not-for-profit private schools, and the floor debate defendants quote indicates that if an exemption does exist it includes only members of an "order." While the court accepts employees' testimony that they viewed their work as a personal ministry, there is no testimony to indicate that they considered themselves—or that they should be viewed—as members of an order.

If the exemption of which defendants complain exists and applies to other schools, defendants have standing to complain that it amounts to unconstitutional establishment. *See Forest Hills Early Learning Center v. Grace Baptist Church,* 846 F.2d 260, 262 (4th Cir.1988). However, defendants' presentation at trial suffered from an almost complete lack of proof on this issue. "An argument that an employee is exempted from coverage of the Act is in the nature of an affirmative defense, and it is the employer's burden to establish the exemption clearly." *Triple "AAA" Co. v. Wirtz,* 378 F.2d 884, 887 (10th Cir.1967). Shenandoah has not met its burden in this regard.

■ Aside from the excerpts from House floor debate described above, defendants offer only a reference to an EEOC opinion letter as authority for the proposition that the asserted exemption, as to which the statutory language is silent, exists in law. *See* intervening defendants' exhibit 2. More importantly, at trial defendants offered no credible evidence that any employees of other schools are in fact being treated as exempt, or that other schools are able with impunity to pay members of religious orders less than the minimum wage, or to pay male members more than female members for the same work.[11] Nor did they offer significant proof as to why an exemption for members of orders would work to prefer certain denominations over others. For these reasons, the court is in no position to pass on the constitutionality of the exemption defendants would have it infer. The court must therefore reject defendants' third constitutional defense to application of the Act. Moreover, even if the court were to conclude that the Establishment Clause mandated invalidation of the exemption for members of religious orders, such invalidation would not excuse defendants from complying with the Act.[12]

### (e) Relief

■ The government brings this action pursuant to 29 U.S.C. § 216 (1982), which authorizes it to sue to recover "unpaid minimum wages or overtime compensation and an equal amount as liquidated damages." The section authorizes the government to

**11.** One of Shenandoah's witnesses, Dr. Paul A. Kienel, executive director of the Association of Christian Schools International, testified briefly about the work nuns perform in Roman Catholic schools, but his testimony does not indicate that he has personal knowledge of such matters. He said that he had studied Catholic parochial schools, but his description of his research was too ambiguous for the court to credit his expertise in the subject. *See* Trial Transcript at 2–115 to 2–118.

**12.** Courts have inferred that persons who function as clergy are exempt from the Act and from similar statutes. *See Rayburn v. Gen. Conference of Seventh–Day Adventists,* 772 F.2d 1164 (4th Cir.1985), *cert. denied,* 478 U.S. 1020, 106

S.Ct. 3333, 92 L.Ed.2d 739 (1986). This ministerial exclusion "does not depend upon ordination but upon the function of the position." *Id.* at 1168. "As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision of participation in religious ritual and worship, he or she should be considered 'clergy.'" *Id.* at 1169 (quotation omitted). Testimony at trial indicates that the employees for whom the government brings this action did not function in their jobs at the school as clergy, and the defendants do not seriously argue that the ministerial exception should apply to them.

"supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to any employee or employees" under 29 U.S.C. §§ 206, 207. Section 216(c) continues:

> Any sums thus recovered ... on behalf of an employee pursuant to this subsection shall be held in a special deposit account and shall be paid ... directly to the employee or employees affected. Any such sums not paid to an employee because of inability to do so within a period of three years shall be covered into the Treasury of the United States.

In equal pay claims, the government may sue employers to pay women as back wages the same additional amount men were paid to perform equal work. 29 U.S.C. § 206(d)(3) (1982). *See Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981).

Section 216 allows the government to seek an award of liquidated damages, but the government has not done so, either in its complaint or on brief or argument to the court. In any case, liquidated damages are not appropriate where an employer sustains the "plain and substantial burden of persuading the court by proof that his failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." *Wright v. Carrigg*, 275 F.2d 448, 449 (4th Cir.1960) (quotation omitted). *See also* 29 U.S.C. § 260 (1982), which authorizes the court to "award no liquidated damages" pursuant to § 216 where an employer satisfies the court that its failure to comply with the Fair Labor Standards Act arose "from good faith" and that the employer had "reasonable grounds for believing" it had not violated the Act. *But Cf. Crosland v. Charlotte Eye, Ear and Throat Hosp.*, 686 F.2d 208, 216–17 (4th Cir.1982). The court finds from the evidence that Shenandoah's failure to comply with the Act was rooted in a good-faith conviction that the Act did not apply to it. The court concludes that the colorable First Amendment claims on which the church based this belief were sufficiently reason-

able as to render a damage award against it unfair.

While the government has not sought liquidated damages, it argues that the employees whose interest it represents are entitled to an award of prejudgment interest in order to be made whole. Section 216 does not expressly provide for the payment of interest. A defendant ordered to pay liquidated damages should not also be forced to pay prejudgment interest. "Allowance of interest on minimum wages and liquidated damages ... tends to produce the undesirable result of allowing interest on interest." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 715–16, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). *See also J.F. Fitzgerald Constr. Co. v. Pedersen*, 324 U.S. 720, 724, 65 S.Ct. 892, 894, 89 L.Ed. 1316 (1945). These cases involved employees' private actions under § 216(b), but their logic seems equally applicable to a suit by the government under § 216(c). This rule does not apply here, however, since the court finds that a damage award ought not lie.

█ Where the court awards no damages, whether to award interest on a back pay award is committed to the court's sound discretion, based on the equities of the situation. *Clifton D. Mayhew, Inc. v. Wirtz*, 413 F.2d 658, 663 (4th Cir.1969). Here Shenandoah acted with a good-faith belief that the Act did not apply to it, a belief that was based on colorable legal claims. Moreover, there is no contention that Shenandoah has failed to comply with the Act since 1986. For these reasons, the court concludes that the equities of this case militate against an award of prejudgment interest, and the court must deny this aspect of the government's prayer. *See also Wirtz v. Old Dominion Corp.*, 286 F.Supp. 378, 381–83 (E.D.Va.1968).

Shenandoah argues that a back pay award should not apply to single women who did not receive the head-of-household supplement or to students at the school who were paid less than the minimum wage. Shenandoah also urges the court to set off tuition assistance and alms paid to

employees against any back pay award on their behalf. The court must reject these proposals.

 Since the court found that the head-of-household supplement had a discriminatory impact on female teachers and was not based on a factor other than sex,[13] the back pay award should apply to all female teachers who were denied the supplement, the class of persons whom § 206(d) is designed to protect. The court need not decide if Shenandoah could legally have paid a supplement to all married teachers while denying it to all single teachers performing the same work, for that is not the policy the church followed.

 Shenandoah offers no authority as to why a back pay award should not apply to Roanoke Valley's student employees. Shenandoah could have applied to the Department of Labor for a certificate exempting the students from the minimum wage requirement, 29 U.S.C. § 214 (1982), but it did not do so. The Department indicates on brief that the Department might have denied the application in any event. The court concludes that Shenandoah's good faith should excuse it from paying liquidated damages or interest on the award, but good faith alone should not also relieve it of paying students the wages to which the law entitled them.

 The alms and tuition assistance which Shenandoah would have the court set off against a back pay award did not reflect compensation for work. A recipient of both types of aid testified that the church provided such aid to members on the basis of need, whether or not they worked at Roanoke Valley. Trial Transcript at 3–58 to 3–59. Moreover, all of the alms assistance and most of the tuition assistance Shenandoah would have the court set off against a back pay award was provided after the period in which the church was paying employees less than the minimum wage. See defendant's exhibits 18–19.[14] The fact that an employer has paid an employee wages above the statutory minimum in one period will not cure its failure to pay the employee at the minimum rate in another. *Roland Electrical Co. v. Black*, 163 F.2d 417, 420–21 (4th Cir.1947), *cert. denied sub nom. Black v. Roland Electrical Co.*, 333 U.S. 854, 68 S.Ct. 729, 92 L.Ed. 1135 (1948). The court therefore will not set off alms or tuition assistance against a back pay award.

 Defendants also ask for the return of any portion of the back pay award the government finds itself unable to distribute to Roanoke Valley employees. The Act provides, however, that "[a]ny such sums not paid to an employee because of inability to do so within a period of three years shall be covered into the Treasury of the United States as miscellaneous receipts." 29 U.S.C. § 216. This statutory language precludes the court from considering Shenandoah's request.

 In addition to seeking back pay on behalf of the employees, plaintiff Department of Labor also prays the court to enjoin Shenandoah from violating the Act in the future or from soliciting the return of back pay the court awards to the school's present and former employees. As there is no suggestion that the church has violated the Act since 1986, however, the court finds that future violations need not be enjoined. This decision will suffice to put Shenandoah on notice that it must comply with the Act. The court also finds

---

**13.** Indeed, the parties stipulate that only one full-time male teacher was denied the supplement. "[O]nce the Secretary has carried his burden of showing that the employer pays workers of one sex more than workers of the opposite sex for equal work, the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974). Shenandoah has not carried this burden, and the court finds that the head-of-household supplement was not based on a factor other than sex.

**14.** Only Joyce Martin received tuition assistance for her children during the same years that she was paid less than the minimum wage. See defendant's exhibit 19. Since the assistance did not represent compensation, the court will not set off the tuition assistance she received against the portion of the back pay award allocated to her, which totals $55.71.

that an injunction against solicitation should not lie. In finding that enforcement of the Act would not violate the intervening defendants' free exercise rights, the court relied heavily on the fact that school employees may return to the church any portion of their wages they desire. The court therefore should not hinder their ability to do so. In so ruling, the court trusts that Shenandoah recognizes that any return of wages should be voluntary and that reprisals against employees for exercising their rights under the Act would violate 29 U.S.C. § 215(a)(3) (1982). *See Tony and Susan Alamo Found., supra,* 471 U.S. at 304, 105 S.Ct. at 1963.

### Conclusion

Based on these conclusions of law, the court will enter judgment for the government with a back pay award for the employees for whom the government brought this action. The court will order Shenandoah to pay over to the plaintiff Department of Labor the sum of $16,818.46 to be distributed as back pay to employees who are the subject of its minimum wage claim in accordance with the provisions of 29 U.S.C. § 216(c), and to pay over to the plaintiff EEOC the sum of $177,680 to be distributed as back pay to employees who are the subject of its equal pay claim, likewise in accordance with the terms of 29 U.S.C. § 216(c). Funds which the plaintiffs are unable to distribute within three years will revert to the Treasurer of the United States.

The court will enter an appropriate order this day.

### FINAL ORDER

For reasons stated in the accompanying Memorandum Opinion filed this day, it is

ORDERED

that the intervenor-defendants shall be and hereby are dismissed from this action, as their position is without merit. Judgment in the case shall be and hereby is entered for plaintiff Department of Labor in the amount of $16,818.46 and for plaintiff Equal Employment Opportunity Commission in the amount of $177,680. Defendant Shenandoah Baptist Church is to pay over these amounts to plaintiffs to be distributed as back pay to the employees for whom plaintiffs brought this action in accordance with the terms of 29 U.S.C. § 216(c) (1982). Funds which plaintiffs are unable to distribute within three years shall be covered into the Treasury of the United States. Plaintiff Department of Labor's motion for prospective injunctive relief shall be and hereby is DENIED.