EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

TREE OF LIFE CHRISTIAN SCHOOLS, Defendant.

No. C–2–85–1771.

United States District Court, S.D. Ohio, E.D.

Oct. 22, 1990.

**702**

Charles E. Guerrier, E.E.O.C., Dist. Office, Cleveland, Ohio, for plaintiff.

Jack Rolland Alton, Lane, Alton & Horst, Columbus, Ohio, for defendant.

## MEMORANDUM AND ORDER

HOLSCHUH, Chief Judge.

The Equal Employment Opportunity Commission (hereinafter "EEOC") filed this action against the Tree of Life Christian Schools (hereinafter "Tree of Life") on November 1, 1985, seeking to enforce the provisions of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, specifically the Equal Pay Act of 1963 (the "Act"). The EEOC alleges that Tree of Life's practice of paying a family allowance to certain of its employees is based on sex and is therefore violative of that Act. In its answer Tree of Life denies violating the Equal Pay Act and raises affirmative defenses under the Religion Clauses of the First Amendment to the Constitution of the United States. This matter is presently before the Court on motion of plaintiff for summary judgment.

## I. STATEMENT OF FACTS

Defendant Tree of Life is a private educational institution, sponsored by four separate Church of Christ congregations, providing instruction on preschool, elementary, secondary levels. Tree of Life began operation in the 1978–79 school year, and is organized as an Ohio not-for-profit corporation exempt from taxation under section 501(c) of the Internal Revenue Code of 1954. According to defendant, the four Church of Christ congregations which sponsor Tree of Life Christian Schools are part of a faith tradition known as the American Restoration Movement the principal teaching of which is that the New Testament represents the valid existing contract between God and his people today. The key teaching of the Restoration tradition churches is that the Christian believer is not fully discharging his scriptural obligation, or meeting his primary religious imperative, unless he is giving witness to his beliefs through his life choices and actions. Particularly relevant for purposes of this case, Tree of Life and its sponsoring churches adhere to the conviction that the Scriptures place the responsibility of the head of a family on the husband when he is physically able to accept that role.

During its second year of operation Tree of Life adopted a policy of paying to those members of its professional staff who qualified as "heads of households" an additional monetary allowance, originally $1000 and subsequently increased to $1500. "Head of household" is defined by the school to mean those persons who are married and have dependent children. In accordance with the Schools' beliefs, a female may only qualify for the head of household allowance if her husband is either absent or unable to work. If the husband is able to work but chooses not to (for example, to pursue an education), the female would not qualify for the "head of household" allowance. Since the institution of the family allowance program, only two female faculty members have received the allowance. One of these is a widow who has been paid

the allowance since 1980, and the other is a divorcee with dependent children.

Tree of Life maintains that when it instituted its family allowance policy it was advised by Mr. Dan Monley of the EEOC that the payment was not unlawful. Nonetheless, in the summer of 1985 the EEOC initiated an investigation into Tree of Life's policy. This investigation culminated in the issuance of a Letter of Violation to Tree of Life, dated July 26, 1985, charging it with violating the Equal Pay Act of 1963, 29 U.S.C. § 206(d). The EEOC demanded that all employees be paid the supplemental allowance, and sought back pay in the total amount of $131,700 for the school years 1982–83, 1983–84, and 1984–85.

After the parties' efforts to settle the matter failed, the EEOC instituted this litigation. In this action the EEOC asks for a permanent injunction enjoining defendant from discriminating in its pay practices on the basis of sex, and for back wages on behalf of several individuals. Specifically, according to its reply memorandum, the EEOC seeks damages only for two years and only on behalf of those individuals who, had they been male, would have received the head of household allowance, *i.e.*, married female employees with dependent children. In its answer, Tree of Life denies being in violation of the Equal Pay Act, arguing that its allowance policy is based on a "factor other than sex," an affirmative defense under 29 U.S.C. § 206(d)(1). Assuming that it is found to be in violation of the Act, Tree of Life argues that as a pervasively religious ministry, application of the Act to Tree of Life's pay policies would be an unconstitutional encroachment on its rights under the Free Exercise and Establishment Clauses of the First Amendment.

## II. STANDARD FOR SUMMARY JUDGMENT

Fed.R.Civ.P. 56(c) provides:

[Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original); *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 728–29, 88 L.Ed. 967 (1944)); *accord County of Oakland v. City of Berkley*, 742 F.2d 289, 297 (6th Cir.1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for a directed verdict. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

"The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence

that has been admitted." *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745, n. 11 [103 S.Ct. 2161, 2171, n. 11, 76 L.Ed.2d 277] (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512. Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1).

■ In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970) (footnote omitted); *accord Adams v. Union Carbide Corp.,* 737 F.2d 1453, 1455–56 (6th Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). Inferences to be drawn from the underlying facts contained in such materials must also be considered in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Ass'n,* 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes,* 398 U.S. at 157–60, 90 S.Ct. at 1608–10.

■■ If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,*

477 U.S. at 322, 106 S.Ct. at 2552. The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

The underlying facts at issue in this case are for all practical purposes undisputed. The parties agree that the head of household allowance is designed to be paid to married faculty members with dependent children. However, because it is defendant's belief that the Scriptures place the responsibility of head of the household upon the husband if he is physically able to accept that responsibility, the head of household allowance is generally only paid to male faculty members who are married and who have dependent children. A married female faculty member with dependent children would only receive the allowance if her husband was absent or was unable to work. Under this system, four male faculty members and one female faculty member received the allowance during the 1985–86 school year. As previously stated, the EEOC seeks in this action to enjoin the continued use of the allowance to discriminate allegedly on the basis of sex, and to recover back wages on behalf of those married female faculty members with dependent children who, had they been male, would have received the allowance. In light of the foregoing established facts, the only remaining questions are questions of law: whether defendant's employees and activities are within the coverage of the FLSA; whether Tree of Life's allowance is

based on a "factor other than sex," *see* 29 U.S.C. § 206(d)(1)(iv); and whether application of the Equal Pay Act to defendant's activities would violate the Free Exercise and Establishment clauses.

## III. DISCUSSION

Before moving to the several statutory and constitutional arguments presented by the parties, the Court must first determine, as a threshold matter, whether the particular activities in which defendant is engaged are subject to the requirements of the FLSA. This involves a two-step inquiry: first, whether defendant Tree of Life is engaged in an "enteprise" as defined in the FLSA, particularly in 29 U.S.C. § 203(r); and second, whether the employees in question, Tree of Life's teachers and administrators, are "employees" within the meaning and coverage of the Act. *See Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 295, 105 S.Ct. 1953, 1958, 85 L.Ed.2d 278 (1985).

■ Considering first Tree of Life's activity as an "enterprise," the Court notes that there is little in the way of argument on this point from either party. However, defendant appears to at least raise the issue, stating that it is "questionable" and citing *Tony & Susan Alamo Found.* Having reviewed the applicable statutory provisions, the Court concludes that Tree of Life is an entity subject to the Equal Pay Act, as Tree of Life is clearly engaged in an "enterprise" within the meaning of 29 U.S.C. § 203(r). *See Donovan v. Weber*, 723 F.2d 1388, 1391–92 (8th Cir.1984) (holding that although the determination of enterprise coverage must be resolved on the facts of each case, it is nevertheless a question of law).

Section 203(r) defines "enterprise" as "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." For purposes of this definition, "the activities performed by any person or persons ... in connection with the operation of ... a preschool, elementary or secondary school ... (regardless of whether or not such ... school is public or private or operated for profit or not for profit) ... shall be deemed to be activities performed for a business purpose." *See also* § 203(s)(5). Section 203(v) and (w) define elementary and secondary schools as schools providing elementary and secondary education as determined under state law. As it is undisputed that Tree of Life Christian Schools provides elementary and secondary education as determined under Ohio law, the Court finds that the activities performed in connection with the operation of the school are subject to the Fair Labor Standards Act, notwithstanding the fact that the school is church-operated. *Accord Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1393–96 (4th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 131, 112 L.Ed.2d 99 (1990); *EEOC v. Fremont Christian School*, 781 F.2d 1362 (9th Cir.1986).

■ The next question is whether Tree of Life's faculty members are "employees" within the coverage of the FLSA. The Act defines "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and the ultimate conclusion whether an individual falls within this definition is a legal determination. *See Castillo v. Givens*, 704 F.2d 181, 185 (5th Cir.), *cert. denied*, 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983). Here there is no dispute that the faculty members are "employees" in the common understanding of that term—they provide a service to Tree of Life Christian Schools (an "employer" under the Act) and its students and receive salaries for this service. Thus, the faculty members are employees as a matter of "economic reality." *Tony & Susan Alamo Found.*, 471 U.S. at 301, 105 S.Ct. at 1962. However, whether they are employees under the FLSA requires, in this case, inquiry beyond the economic reality test. Specifically, the Court must consider whether services provided by these faculty members to the schools, and the role each fulfills in the sponsoring churches, place them beyond the Act's coverage.

Defendant argues that to subject the schools to the equal pay provisions of the FLSA would infringe on their freedom of

religious expression in violation of the Free Exercise Clause. Defendant also argues that application of the Equal Pay Act here would be contrary to the Establishment Clause. These two arguments stem from defendant's underlying position that its faculty members are not merely "employees," but that they are "ministers" of the sponsoring churches. This raises the threshold question of whether they are employees covered by the Act, or whether they fall within a so-called "ministerial exemption" from the Act.

The ministerial exemption, as explained in the recent case of *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1396–97 (4th Cir.1990), derives from a portion of the legislative debate on the 1966 amendments to the FLSA, in which it was noted that "it is not the ... intention to include members of a religious order under the definition of employee." 112 Cong.Rec. 11371 (1966). Cases considering a ministerial exemption in the context of Title VII have indicated that the exemption does not depend upon ordination of the individual but upon the function of the position held. *See Rayburn v. General Conference of Seventh–Day Adventists*, 772 F.2d 1164, 1168–69 (4th Cir.1985) (citing *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 283 (5th Cir.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982)), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). It has also been noted that "[w]hile religious organizations may designate persons as ministers for their religious purposes free from any governmental interference, bestowal of such a designation does not control their extra-religious legal status." *Southwestern Baptist Theological Seminary*, 651 F.2d at 283. Moreover, "[e]xemptions from the Fair Labor Standards Act are narrowly construed," *Hodgson v. Duke Univ.*, 460 F.2d 172, 174 (4th Cir.1972), *quoted in Shenandoah Baptist Church*, 889 F.2d at 1397, and ministerial exemptions have been construed narrowly in other contexts. *See Dickinson v. United States*, 346 U.S. 389, 394, 74 S.Ct. 152, 156, 98 L.Ed. 132 (1953) (noting in the context of the selective service ministerial exemption that "[c]ertainly all members of a religious organization or sect are not entitled to the exemption by reason of their membership, even though in their belief each is a minister"); *Olsen v. Commissioner*, 709 F.2d 278, 282 (4th Cir.1983).

Defendant argues that "[a]ll of the teachers and administrators of Tree of Life Christian Schools are, first and foremost, teachers of the Christian faith, and consider their work in the religious ministry of the Schools to be a religious calling or vocation.... Their primary responsibility is to inculcate the Christian religion in the students who are in their charge, thereby sharing in the Churches' mission to transmit Christian faith to the next generation." The teachers and administrators of Tree of Life submit a joint affidavit in which they indicate that they "choose to pursue a religious vocation to bring the Word of God to young Christians, through word and deed, by serving on the faculty or administrative staff of Tree of Life Christian Schools." It is not for this Court to question the sincerity of the religious convictions of these individuals, nor does the Court minimize the vocation they have chosen. *See Shenandoah Baptist Church*, 899 F.2d at 1397. However, as noted earlier, the churches' designation of these persons as "ministers" for religious purposes does not determine their extra-religious legal status. There is no indication that any of the teachers are ordained ministers of the churches, nor do they perform sacerdotal functions. *Id.* at 1396. Although it appears undisputed that the principles of the Christian faith pervade the schools' educational activities, this alone would not make a teacher or administrator a "minister" for purposes of exempting that person from the FLSA's definition of "employee." To hold otherwise, as noted in *Shenandoah Baptist Church*, "would 'create an exception capable of swallowing up the rule,'" *id.* at 1397 (quoting *Donovan v. Shenandoah Baptist Church*, 573 F.Supp. 320, 323 (W.D.Va.1983)), which would be contrary to the fact that the term "employee" in section 203(e) was given "the broadest definition that has ever been included in any one act." *United States v.*

*Rosenwasser*, 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, n. 3, 89 L.Ed. 301 (1945) (quoting 81 Cong.Rec. 7657 (1935) (remarks of Sen. Black)).  For the foregoing reasons, the Court must conclude that the teachers and administrators in question do not fulfill the function of a minister within the meaning of the ministerial exemption to the FLSA, *Fremont Christian School*, 781 F.2d at 1370, and that they are "employees" within the coverage of the FLSA.  *Accord Shenandoah Baptist Church*, 899 F.2d at 1397. Having found that defendant and the employees in question are within the Act's coverage, the Court will now consider the application of the Act to the particular employment practice in question.

## A.  GOOD FAITH

■ Tree of Life maintains that when it instituted the family allowance policy it was advised by a representative of the EEOC, Mr. Dan Monley, that the payment was not unlawful.  EEOC does not address this issue other than to say that it has no record of the communication.  There may be a genuine issue of fact as to whether Tree of Life was acting in good faith or had reasonable grounds to believe, at the time it instituted its family allowance policy, that the policy was not in violation of the Equal Pay Act.  However, because of the limited nature of the damages sought by the Commission, the issue is immaterial to this action.

Congress has provided for instances in which an employer acts with a reasonable belief that its policies are not unlawful.  29 U.S.C. § 260 provides that:

> In any action ... to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages ... if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation ... the court may, in its sound discretion, award no liquidated damages....

Thus, where there is reasonable grounds for an employer's belief that he is in compliance with the Equal Pay Act, the court may limit damages to a compensatory recovery.  Here, however, the EEOC is seeking damages only in the amount of back wages due those female employees who, had they been male, would have received the head of household allowance.  Thus, any reliance on Tree of Life's part is immaterial to this action.

## B.  "FACTOR OTHER THAN SEX"

■ The statutory argument raised by defendant in opposition to summary judgment is that it is not in violation of the Equal Pay Act because its policy of granting a "head of household" allowance is based on a "factor other than sex," one of four affirmative defenses permitted under 29 U.S.C. § 206(d)(1).  Tree of Life argues that "factor other than sex" should include "fidelity to religious principle."  Tree of Life points out that the Supreme Court has noted that "the fourth affirmative defense ["factor other than sex"] is a 'broad principle,' which 'makes clear and explicitly states that a differential based on any factor or factors other than sex would not violate this legislation.'"  *County of Washington v. Gunther*, 452 U.S. 161, 170–71 n. 11, 101 S.Ct. 2242, 2248 n. 11, 68 L.Ed.2d 751 (1981) (quoting 109 Cong.Rec. 9203 (1963) (remarks of Rep. Griffin)). Similarly, the Sixth Circuit, analyzing the legislative history of the Equal Pay Act, has concluded that "Congress intended exception (iv) to include factors other than traditional job evaluation criteria."  *Bence v. Detroit Health Corp.*, 712 F.2d 1024, 1029 (6th Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1282, 79 L.Ed.2d 685 (1984).

In *EEOC v. J.C. Penney Co.*, 843 F.2d 249 (6th Cir.1988), the Sixth Circuit adopted "the legitimate business reason standard" as "the appropriate benchmark against which to measure the 'factor other than sex' defense."  *Id.* at 253.  Under the "legitimate business reason" test, the employer must "show only that the factor was adopted for a legitimate business reason and used reasonably in light of the employer's stated purpose."  *Id.*

Tree of Life contends that its "business" is "nothing more than the practice of religion." Thus, its practice of giving witness to its twin beliefs in "giving aid to those most in need" and in the "divinely ordained status of individuals within the family structure" constitutes a "legitimate business reason" for its adoption of the head of household allowance. Defendant's position is that the family allowance is based on need and family status, and not on sex: the allowance is limited to married persons with dependent children because they are considered to be most in need; and the allowance is limited to male faculty members in most instances because they are considered to be the head of the household. However, the distinctions between married and single persons, and between persons with dependent children and persons without dependent children, are not before the Court. Rather, the EEOC is only seeking back wages on behalf of female employees who, had they been male, would have received the allowance. Thus, the only relevant distinction is the distinction between married male faculty members with dependent children and married female faculty members with dependent children, and the question is whether the distinction between these two groups based upon a religious belief that the male is the head of the household is a distinction which is based on a "factor other than sex."

The Ninth Circuit, in *EEOC v. Fremont Christian School*, 781 F.2d 1362 (9th Cir. 1986), confronted this very question of whether religious convictions defining head of household on the basis of sex could nevertheless constitute a "factor other than sex." Rejecting the claim that this defense applied under the circumstances presented, the court quoted with agreement the following passage from 29 C.F.R. § 800.149:

Sometimes differentials in pay to employees performing equal work are said to be based on the fact that one employee is head of a household and the other, of the opposite sex, is not. In general, such allegations have not been substantiated. Experience indicates that where such factor is claimed the wage differentials tend to be paid to employees of one sex only, regardless of the fact that employees of the opposite sex may bear equal or greater financial responsibility as head of a household or for the support of parents or other family dependents. Accordingly, ... the general position of the Secretary of Labor and the Administrator is that they are not prepared to conclude that any differential allegedly based on such status is based on a 'factor other than sex' within the intent of the statute.

*Id.* at 1367.

Defendant cites *Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) and *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) for the proposition that the Supreme Court has implicitly accepted the notion that a differential may be based on a factor other than sex even though the sex of the individual may have played a part in the resulting differential. In *Manhart*, female employees were required to make larger contributions to a pension fund than male employees. The employer attempted to justify the policy by arguing that it was based on longevity, not sex, *i.e.*, on the fact that females live longer than males. The court found the argument to be factually insupportable, stating: "any individual's life expectancy is based on a number of factors, of which sex is only one. The record contains no evidence that any factor other than the employee's sex was taken into account" in calculating the differential between the respective contributions by men and women. *Id.* at 712, 98 S.Ct. at 1377. The Court noted that the policy "distinguished only imperfectly between long-lived and short-lived employees, while distinguishing precisely between male and female employees." *Id.* at 713 n. 24, 98 S.Ct. at 1377 n. 24.

Tree of Life distinguishes *Manhart* on the ground that its own family allowance policy "correlates perfectly with the religious beliefs asserted as the basis for Tree of Life's policy and distinguishes only to a limited extent between its male and female

teachers." In support of this Tree of Life points to the fact that the allowance has been paid to some male and some female employees. But the simple fact is that under Tree of Life's policy *identically situated* teachers and administrators are differentiated, and no factor other than sex accounts for the disparate treatment in this circumstance.

While the pay differential correlates with Tree of Life's religious conviction, to say that giving witness to a religious belief is a "legitimate business reason" is to stretch the parameters of the Sixth Circuit's test of "factor other than sex" well beyond the context of the cases in which the court has applied that test. The *J.C. Penney* case involved a "head of household" provision of Penney's medical and dental insurance plan, which permitted an employee to elect coverage for his or her spouse only if the spouse earned less than the employee. The court agreed with the district court's finding that the policy was legitimately based on a "factor other than sex" since Penney had adopted the requirement in order to provide the greatest benefits for the people who needed the coverage, "workers without a more highly paid spouse," and because "the ... requirement was an administratively efficient proxy to avoid covering those spouses most likely to have coverage from their own employers." *Id.* at 253. Of significance to the case at hand is the *J.C. Penney* court's finding that "[t]here was no evidence that Penney made its decision for discriminatory reasons or to impose any social judgments or patriarchal views on its employees." *Id.* at 254.

In *Phillips*, the Supreme Court remanded for "fuller development of the record and for further consideration" a Title VII case involving an employer that maintained a hiring policy which allowed men with pre-school-age children to be hired but precluded women with pre-school-age children from being hired. Tree of Life points to the Court's suggestion that an employer's policy might be lawful if it could be shown that "conflicting family obligations" were more relevant to a woman's job performance than a man's. *Id.* at 544, 91 S.Ct. at 497–98. However, defendant in this case

has made no similar claim that the job performance of female teachers with children suffers disproportionately in comparison with their male counterparts.

Since Tree of Life's head of household allowance policy is in fact based on sex, albeit as a means of giving witness to a religious belief that men and women occupy different family roles, its argument that the policy is based on a "factor other than sex" within the meaning of 29 U.S.C. § 206(d)(1)(iv) must fail.

## C. CONSTITUTIONAL ISSUES

As previously stated, Congress intended that the provision of the Equal Pay Act should apply to the activities such as those engaged in by Tree of Life. *See Shenandoah Baptist Church*, 899 F.2d at 1395. However, Tree of Life argues that to apply the Act and invalidate its head of household allowance would violate its rights under the Religion Clauses of the First Amendment.

### 1. *The Free Exercise Clause*

Although the defendant dedicates a considerable portion of its brief and supporting affidavits to arguing the bona fides of its beliefs, the EEOC does not challenge the sincerity of the defendant's belief in the doctrine of literal biblical interpretation, nor the defendant's belief that a literal interpretation of the Bible yields the unshakable truth that, while equal in the eyes of God, husbands and wives stand on different footings with respect to their familial roles. The EEOC's position is as follows: regardless of how sincerely these beliefs are held by the Churches and its members, the Equal Pay Act embodies a compelling governmental interest in ending sex-based discrimination in the workplace; and second, the application of the Act would not substantially impact upon the defendant's beliefs. The EEOC argues that it is merely seeking to prohibit the defendant from manifesting its beliefs in the form of disparate wages within its schools based solely on the sex of the employee. The defendant responds by argu-

ing that its beliefs and practices are inextricably intertwined; that a suppression of the practice is a suppression of the belief. This, defendant argues, violates the Free Exercise Clause of the First Amendment.

■■■■■ The Free Exercise Clause is not an absolute barrier to governmental regulation of any aspect of religious enterprises. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The First Amendment "embraces two concepts, —freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Id.* at 303–04, 60 S.Ct. at 903. Statutes are not invalid simply because they may in some way affect the otherwise unfettered operation of a religious institution. *See Thomas v. Review Board*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981).

The Ninth Circuit considered an almost identical case in *Fremont Christian School*, 781 F.2d 1362. In *Fremont*, the EEOC brought an action against a religious school, contending that the school's policy of extending health insurance benefits only to "head of household" employees, interpreted by the School to mean single persons and married men, violated Title VII and the Equal Pay Act. The court concluded that the EEOC was entitled to partial summary judgment, finding that "the existence of a strong compelling state interest in eradicating discrimination, coupled with the fact that eliminating the employment policy involved here would not interfere with religious belief, and only minimally, if at all, with the practice of religion." *Id.* at 1364.

In *Fremont*, the church-sponsored school applied a uniform pay scale to all of its employees, and offered all employees disability and life insurance regardless of sex or marital status. However, the school offered health insurance as a fringe benefit, but only to single persons and married males, considered to be "heads of households." The teachings of the church in *Fremont* were, at least insofar as the familial roles of husbands and wives, similar to the instant defendant's: only a man could be a "head of household," regardless of what his salary is in relation to that of his wife.

The defendant in *Fremont* raised the same constitutional arguments raised here. The court said that in determining whether a neutrally based statute violates the Free Exercise Clause, courts must weigh three factors:

(1) the magnitude of the statute's impact upon the exercise of religious belief,

(2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief, and

(3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

*Id.* at 1367 (citing *EEOC v. Pacific Press Publishing Ass'n*, 676 F.2d 1272, 1279 (9th Cir.1982)). *See Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793–94, 10 L.Ed.2d 965 (1963).

■■■■ Tree of Life takes issue with the *Pacific Press* Free Exercise test employed by the *Fremont* court and cited by the EEOC in its motion. According to Tree of Life, the test set forth in *Wisconsin v. Yoder* is best characterized as a four-part test: (a) Is religious exercise truly involved? (b) Is the governmental action injurious to that exercise? (c) If so, has the government shown that its action is nonetheless necessitated by a compelling state interest? (d) May the state interest be achieved by means less restrictive than the governmental action in question? However, the *Pacific Press* test, at least as applied by the *Fremont* court, is not at great variance with Tree of Life's. Conceptually, the Supreme Court appears to balance three factors in Free Exercise cases: (1) the character of the burden on religious freedom; (2) the magnitude of the government interest; and (3) whether less drastic means of achieving the governmental objective are available. As more succinctly stated in *Hernandez v. Commis-*

*sioner*, 490 U.S. 680, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989): "The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden."

In its examination of the magnitude of the statute's impact upon the exercise of the defendant's religious beliefs, the *Fremont* court first quoted from a statement made by the head of the church: "[T]he Church, believing as it does, in the God-given dignity and the special role of women, could not, without sin, treat women according to unfair distinctions." *Fremont*, 781 F.2d at 1368. The court found this statement to be evidence that "preventing the sex discrimination involved in this case should have no significant impact on Fremont Christian's religious beliefs or doctrines." *Id.* However, it would seem that the court's reasoning on this point is somewhat questionable, since the defendant was asserting that, with respect to the biblical definition of "head of household," differentiation on the basis of sex was *not* an unfair distinction. The court also pointed to the fact that the defendant had previously abandoned a policy of paying the "head of household" at a rate higher than similarly situated female employees, because they felt that it may have been illegal to do so, as evidence that "there would be no substantial impact upon religious beliefs by forcing Fremont Christian to drop a similar policy of giving heads of household health insurance, to the exclusion of similarly situated women." *Id.*

██ Here, although Tree of Life steadfastly maintains its position that the Bible makes a distinction between the familial roles of men and women, it concedes that the Bible does not mandate that men must be paid more than women for identical tasks. Rather, the "head of the household" allowance is the Schools' chosen way of exercising its beliefs, arrived at "through prayer and reflection on God's word." The Court does not question the sincerity of defendant's belief or the fact that the head of household allowance is a

form of bearing witness to that belief. However, although the application of the Equal Pay Act would burden Tree of Life's freedom to select the manner in which it will bear witness to the belief that the husband is the head of the household, in the Court's view the burden imposed upon defendant's central religious beliefs would be limited. *Accord Shenandoah Baptist Church*, 899 F.2d at 1397–98.

Considering next the magnitude of the state interest involved, the *Fremont* court had no difficulty in finding a compelling state interest in Title VII: " 'By enacting Title VII, Congress clearly targeted the elimination of all forms of discrimination as a 'highest priority'.... Congress' purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions. *E.g., Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (state law prohibiting retail sales on Sunday).' " *Id.* at 1368–69 (quoting *Pacific Press*, 676 F.2d at 1280).

There can be little doubt that the Equal Pay Act is designed to advance a compelling governmental interest: the eradication of sex-based discrimination in the work place:

Congress' purpose in enacting the Equal Pay Act was to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry—the fact that the wage structure of "many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same." ... The solution adopted was quite simple in principle: to require that "equal work will be rewarded by equal wages."

*Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) (citation omitted). As further explained in *Shultz v. First Victoria Nat'l Bank*, 420 F.2d 648, 657–58 (5th Cir. 1969):

[T]his "rule"—equal pay for equal work—was not laid down simply out of concern about the injustice of discrimination, important as that was. It was also laid down out of concern about the economic and social consequences of disparate wages paid to a major portion of the nation's labor force. Such wages not only depressed the living standard of those who received them, they also depressed wages for all workers and particularly workers in certain industries.

Accordingly, the Court concludes that the Equal Pay Act advances compelling state interests, "interests of the highest order," *Yoder*, 406 U.S. at 215, 92 S.Ct. at 1533, against which defendant's head of household allowance must be weighed. *See Shenandoah Baptist Church*, 899 F.2d at 1398.

Finally, the *Fremont* court examined whether the statute was the least restrictive means of achieving the government's objective. The court found that, "although EEOC jurisdiction over religious organizations may have far-reaching effects should the Commission seek injunctive relief, as in this case, or monetary damages against a religious employer, 'the relevant inquiry is not the impact of the statute upon the institution, but the impact of the statute upon the institution's exercise of its sincerely held religious beliefs.'" *Id.* (quoting *Pacific Press*, 676 F.2d at 1280). The court concluded that "[h]aving found the impact on religious beliefs to be minimal at best, we find this third factor to be satisfied." *Id.*

In the instant case, while Tree of Life claims that its beliefs are inseparable from its actions, the church does not claim that either the Scriptures, or the Restoration Movement itself, requires that faith adherents are prohibited from paying women wages equal to those paid to men. As noted earlier, this means of bearing witness to the sect's belief in the differing familial roles of husbands and wives was arrived at, apparently in 1980, "through prayer and voluntary submission to a transcendent reality." Thus, while the belief that men and women occupy different roles within the family may be "deeply rooted in Christian tradition," the practice of paying a "head of the household" allowance to male faculty members apparently developed rather more recently as a manifestation of the belief. The character of the burden imposed on Tree of Life is such that the Schools are merely prohibited from engaging in certain conduct predicated on a religious belief. Thus, the Equal Pay Act does not require the defendant to act contrary to its beliefs; it simply prohibits it from manifesting its beliefs through a sex-based wage schedule. On the other hand, to exempt Tree of Life from the requirements of the Equal Pay Act "would undermine the congressional goal of making minimum wage and equal pay requirements applicable to private as well as public schools." *Shenandoah Baptist Church*, 899 F.2d at 1398.

The Supreme Court has upheld application of the minimum wage, overtime, and record-keeping provisions of the Fair Labor Standards Act to religious organizations. In *Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985), the court rejected both Free Exercise and Establishment Clause challenges in the case of a non-profit religious organization whose income was derived from commercial enterprises staffed by the Foundations' "associates," most of whom were reformed drug addicts, criminals, and derelicts. The court stated that "the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights." *Id.* at 303, 105 S.Ct. at 1962. The court found that despite the Foundation's claim that receipt of "wages" would violate the religious freedom of its associates, "there is nothing in the Act to prevent the associates from returning the amounts to the Foundation, provided that they do so voluntarily." *Id.* at 304, 105 S.Ct. at 1963.

Like the petitioners in *Tony & Susan Alamo Found.*, Tree of Life argues that application of the Act would offend the religious beliefs of its teachers and administrators. Tree of Life has submitted affi-

davits signed by its teachers and administrators, as well as its head administrator, Jayne Marrah, to the effect that they are in full agreement with the churches' beliefs and with the practice of awarding male heads of households an allowance not afforded to similarly situated female faculty members. Tree of Life further argues that compliance with the Equal Pay Act would violate not only the religious beliefs of its employees but of the church-related institution itself. However, in the final analysis, it would seem that the crucial point is that application of the Equal Pay Act would not "actually burden" the Schools' right to its beliefs; it would merely prevent the School from employing one means of giving witness to its beliefs. Moreover, as in *Tony & Susan Alamo Found.*, there is nothing in the Equal Pay Act to prohibit those eligible female teachers and administrators from returning the allowance.

The Court concludes that the compelling interests underlying the Equal Pay Act substantially outweigh its minimal impact on defendant's religious beliefs in this particular case. Defendant remains free to practice its religious beliefs in ways that do not unlawfully discriminate in its wage scales on the basis of gender. Accordingly, the Court finds defendant's Free Exercise argument is without merit.

### 2. *Establishment Clause*

■ Tree of Life argues that application of the Equal Pay Act would be violative of the Establishment Clause in that it would have the implicit effect of favoring those religions whose beliefs do not conflict with majoritarian precepts. The EEOC conversely argues that granting an exemption from the Act to those religious institutions whose beliefs are contrary to the Act's requirements would result in government preference for such religions.

This is a classic Establishment Clause conflict. Certainly, when government exempts a particular sect from a law which another sect does not find contrary to its religious tenets it is, in effect, favoring a particular religion to the detriment of another. The converse is also true. However, in this regard the Supreme Court has held that a law protecting a valid secular interest is not invalid as one "respecting an establishment of religion" merely because it also incidentally benefits one or more, or all, religions, or because it incidentally affects the capability of religion or religious institutions to survive in society. *E.g., McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (upholding a state Sunday Closing law); *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (upholding public reimbursement for bus transportation to parochial school students).

The Equal Pay Act does not facially differentiate among religions. Thus, the Court must apply the three-pronged Establishment Clause inquiry derived from *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *See Hernandez*, 109 S.Ct. at 2146–47 & n. 11. The *Lemon* test involves an examination of (1) whether the statute has a secular legislative purpose; (2) whether the primary effect of the statute is one that neither advances nor inhibits religion; and (3) whether the statute would lead to excessive entanglement between church and state. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111–12. There is no question that the Equal Pay Act embodies a neutral, secular purpose, *see Tony & Susan Alamo Found.*, 471 U.S. at 305 n. 30, 105 S.Ct. at 1963 n. 30, and that the primary effect of the Act neither advances nor inhibits religion. Tree of Life argues that application of the Act to the Schools would result in excessive Church-state entanglement in violation of the third prong of this test.

■ A secular purpose and facial neutrality are not sufficient to avoid conflict with the Establishment Clause. *Stone v. Graham*, 449 U.S. 39, 41, 101 S.Ct. 192, 193–94, 66 L.Ed.2d 199 (1980); *Roemer v. Board of Public Works*, 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976). The legislation must not foster excessive government entanglement with religion. "Entanglement is a question of kind and degree." *Lynch v. Donnelly*, 465 U.S. 668, 684, 104 S.Ct. 1355, 1365, 79 L.Ed.2d 604

(1984). "[T]he questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." *Walz v. Tax Commission,* 397 U.S. 664, 675, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970). The *Lemon* court set forth three considerations for examination in determining whether a statute involves excessive entanglement: (1) the character and purpose of the institution involved; (2) the nature of the regulation's intrusion into church affairs; and (3) the resulting relationship between the government and the religious authority. *Lemon,* 403 U.S. at 615, 91 S.Ct. at 2112.

### (a) Character and Purpose of the Institution

As discussed earlier, Tree of Life's contention is that its teachers and administrators are essentially ministers, and that it is a pervasively religious institution which includes indoctrination of students as a substantial purpose of its existence. In *Fremont,* the court found, with respect to the character and purpose of the institution, that despite the defendant's contention that its School was an integral part of the religious mission of the Church, and that the role of its teachers was essentially that of a minister, "the duties of the teachers ... do not fulfill the function of a minister." *Id.* at 1370. The court noted that the Fifth Circuit had found the role of Salvation Army workers to be that of a minister, and as such, application of Title VII to the organization to be violative of the Establishment Clause, since the relationship between a church and its ministers is its "lifeblood." *Id.* at 1369 (citing *McClure v. Salvation Army,* 460 F.2d 553, 558–59 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972)). However, the court analogized the case at hand with the Fifth Circuit's later decision in *EEOC v. Mississippi College,* 626 F.2d 477 (5th Cir. 1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981), in which that court "refused to broaden the *McClure* exemption for ministers to include the faculty at Mississippi College, a sectarian school."

*Fremont,* 781 F.2d at 1369. The court further noted that its own decision in *Pacific Press,* 676 F.2d 1272, "refused to apply the *McClure* exemption to an employee of a religious publishing house." *Id.* at 1370.

The *Fremont* court thus characterized the relationship between elementary and secondary school administrators and teachers as more closely akin to the relationship between a college and its faculty than to the relationship between a church and its ministers. The court quoted language from *Mississippi College* to the effect that the faculty and staff of a college do not function as ministers: "The faculty members are not intermediaries between a church and its congregation. They neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine." *Fremont,* 781 F.2d at 1369–70 (quoting *Mississippi College,* 626 F.2d at 485). Thereafter, the *Fremont* court summarily concluded that "the duties of the teachers at Fremont Christian School do not fulfill the function of minister." *Id.* at 1370.

This reasoning of the court in *Fremont* is somewhat at odds with the Supreme Court's holdings on the nature of sectarian elementary and secondary schools and the function of teachers in such schools. The Supreme Court has spoken to the effect that "the *raison d'etre* of parochial schools is the propagation of a religious faith." *Lemon,* 403 U.S. at 628, 91 S.Ct. at 2118. (Douglas, J., concurring). *See also Meek v. Pittenger,* 421 U.S. 349, 366, 95 S.Ct. 1753, 1763, 44 L.Ed.2d 217 (1975) (characterizing such schools as "institution[s] in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission"). The Supreme Court has recognized that a teacher in such a school "is employed by a religious organization, subject to the direction and discipline of religious authorities, and works in a system dedicated to rearing children in a particular faith." *Lemon,* 403 U.S. at 618, 91 S.Ct. at 2114. *See also NLRB v. Catholic Bishop,* 440 U.S. 490, 501, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533 (1979).

No less than the sectarian parochial schools in *Lemon* and *Meek,* Tree of Life Christian Schools is a "pervasively religious institution" whose fundamental reason for being is to inculcate the religious beliefs and values of its sponsoring congregations into the next generation. Even in *Mississippi College* the court found it "readily apparent that the character and purposes of⋅ the College are pervasively sectarian." *Mississippi College,* 626 F.2d at 487. Therefore, with respect to the first consideration of the *Lemon* excessive entanglement inquiry, the court finds it clear that the character and purpose of the institution involved in this case are essentially religious. However, as previously noted, "[e]ven religious schools cannot claim to be wholly free from some state regulation." *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 628, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986) (citing *Yoder,* 406 U.S. at 213, 92 S.Ct. at 1532). The critical inquiry, then, centers on the second and third considerations identified in *Lemon:* the nature of the regulation's intrusion into church affairs, and the resulting relationship between the government and the religious authority. *Lemon,* 403 U.S. at 615, 91 S.Ct. at 2112.

(b) Nature of the Regulation's Intrusion and the Resulting Church–State Relationship

The Supreme Court has found that regulatory permeation of sectarian schools leads to a danger of excessive entanglement. *E.g., Lemon,* 403 U.S. at 620, 91 S.Ct. at 2114–15; *Meek v. Pittenger,* 421 U.S. 349, 370–72, 95 S.Ct. 1753, 1765–67, 44 L.Ed.2d 217 (1975); *Tilton v. Richardson,* 403 U.S. 672, 685, 91 S.Ct. 2091, 2099, 29 L.Ed.2d 790 (1971). *Lemon* involved government aid to parochial elementary and secondary schools, while *Tilton* involved aid to religion-affiliated colleges and universities. In the former the aid was held to foster excessive entanglement, in the latter it was not. With respect to distinguishing the risk of entanglement between sectarian elementary and secondary schools on the one hand, and Church-related colleges and universities on the other hand, the Supreme Court stated: "Since

religious indoctrination is not a substantial purpose or activity of ... church-related colleges and universities, there is less likelihood than in primary and secondary schools that religion will permeate the area of secular education.... Correspondingly, the necessity for intensive government surveillance is diminished and the resulting entanglements between government and religion lessened." *Tilton,* 403 U.S. at 687, 91 S.Ct. at 2100.

The EEOC points out that most Supreme Court opinions dealing with the excessive entanglement issue arose in the context of government aid to sectarian schools rather than regulations thereof. However, it seems clear that entanglement analysis is equally applicable in cases where the government is burdening religious institutions as where it attempts to aid them. For example, in *Walz,* the Court found that granting property tax exemptions to religious institutions led to a lesser degree of church-state entanglement than not granting the exemptions. *Walz,* 397 U.S. at 676, 90 S.Ct. at 1415. The Court also said that "[e]limination of exemption would tend to expand the involvement of government by giving rise to tax valuation of such property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes." *Id.* at 674, 90 S.Ct. at 1414. In *Catholic Bishop,* the Court reasoned that "[g]ood intentions by government ... can surely no more avoid entanglement with the religious mission of the school in the setting of mandatory collective bargaining than in the well-motivated legislative efforts consented to by the church-operated schools which we found unacceptable in *Lemon, Meek,* and *Wolman* [*v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977)]." *Catholic Bishop,* 440 U.S. at 502, 99 S.Ct. at 1319.

Given that application of the Equal Pay Act would be a regulation touching on the relationship between Tree of Life and the teachers and administrators who perform within the pervasively religious schools, the dispositive issues become the extent of the resultant interference with the autonomy of Church administrative affairs and the

level of potential ongoing scrutiny of the school's personnel decisions. Two recent Supreme Court decisions, *Catholic Bishop* and *Tony & Susan Alamo Found.*, are instructive on these matters.

In *Catholic Bishop*, the Court held that the NLRB was without jurisdiction to enforce mandatory collective bargaining upon church-sponsored schools. Although the Court rested its decision on the grounds that Congress had not affirmatively expressed its intention that the National Labor Relations Act covers teachers in schools operated by a church, the Court did indicate that application of the Act to such schools would "present[ ] a significant risk that the First Amendment would be infringed." *Catholic Bishop*, 440 U.S. at 502, 99 S.Ct. at 1319. The Court stated that

> Inevitably the Board's inquiry will implicate sensitive issues that open the door to conflicts between clergy-administrators and the Board, or conflicts with negotiators for unions. What we said in *Lemon* ... applies as well here:
>> "[P]arochial schools involve substantial religious activity and purpose.
>> "The substantial religious character of these church-related schools gives rise to entangling church-state relations of the kind the Religion Clauses sought to avoid."

*Id.* at 503, 99 S.Ct. at 1320 (quoting *Lemon*, 403 U.S. at 616, 91 S.Ct. at 2113). With respect to the nature of potential church-state entanglement, the Court found that it "is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also *the very process of inquiry* leading to findings and conclusions." *Id.* at 502, 99 S.Ct. at 1319 (emphasis added).

However, in *Tony & Susan Alamo Found.*, the Supreme Court found that application of the record-keeping requirements of the Fair Labor Standards Act to a religious organization did not foster excessive entanglement between government and religion. *Tony & Susan Alamo Found.*, 471 U.S. at 305, 105 S.Ct. at 1963–

64. Although the focal point of the Court's inquiry did seem to be the fact that the Foundation employees to which the Act was sought to be applied were employed in commercial enterprises including service stations, hog farms, construction companies, a motel, and a candy distributorship, the Court went on to state that "the routine and factual inquiries required by [29 U.S.C.] § 211(c) bear no resemblance to the kind of government surveillance the Court has previously held to pose an intolerable risk of government entanglement with religion." *Id.* The fact that the Court cited to, *inter alia, Catholic Bishop*, in reference to this last statement would seem to indicate that the Court did not consider the application of any labor legislation, in particular the Fair Labor Standards Act, to necessarily give rise to unconstitutional Church-state entanglement.

This Court finds that in this case application of the Equal Pay Act to Tree of Life Christian Schools does not threaten to entangle the state excessively in the affairs of the Schools. Enforcement of the requirements of the Act does not require the kind of ongoing surveillance and concomitant inquiry into the character of school activities giving rise to excessive entanglement in the school aid cases, as it does not interfere with decisions concerning the hiring of particular individuals as teachers or administrators; nor does the Act interfere with the content of the instruction given in the schools. Balanced against the state's compelling interest in ensuring that men and women are treated with equal dignity in the workplace, whatever minimal church-state involvement results from such application is tolerably within the boundaries of the Establishment Clause. *Shenandoah Baptist Church*, 899 F.2d at 1399.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is GRANTED IN PART. The Court concludes that Tree of Life's "head of household," as currently employed, violates the Equal Pay Act. With regard to the relief sought by the EEOC, consistent with this order the Court

hereby permanently enjoins defendant from continuing to award the head of household allowance in a discriminatory manner on the basis of sex.

In its amended complaint, the EEOC also seeks back wages on behalf of several employees of defendant, such individuals being listed on Exhibit A attached to the amended complaint. However, in its Reply Memorandum in support of its motion for summary judgment the EEOC indicates that it is seeking damages only on behalf of those married female employees with dependent children who, but for the fact that they are female, would be entitled to the allowance. As the EEOC correctly notes, these individuals are "yet to be identified." Thus the Court is unable at this time to determine the damages to be awarded in this case. The Court will determine the appropriate damages once the parties have identified the particular individuals on whose behalf the EEOC is seeking back wages, and once sufficient evidence is presented to calculate the amount of back wages to be awarded.

IT IS SO ORDERED.